**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 08-62076-CIV-ALTONAGA

Magistrate Chris M. McAliley

WALTER GASTALDI, an individual,
DANIEL FISHER, an individual, MARK
MOSES, an individual and KIMBERLY
JONES, an individual, *et al.,*

       Plaintiffs,

vs.

SUNVEST RESORT COMMUNITIES, LC, a
Florida limited liability company, *et al.*,

       Defendants.

_____ /

**PLAINTIFFS' OMNIBUS REPLY IN FURTHER SUPPORT OF THEIR MOTIONS IN**
**LIMINE AND REQUEST FOR LEAVE TO FILE SUPPLEMENTAL RESPONSE**

Plaintiffs hereby submit their Replies in further support of their Motions *in Limine*, filed

on January 6, 2010 (D.E. 212).   Additionally, pursuant to Local Rule 7.1.C., Plaintiffs

respectfully request leave to file its Supplemental Response to IMGA's Motion *in Limine* No. 3:

To Preclude Certain Irrelevant and Unreliable Opinions of Kelly Johnson, filed simultaneously

with this request, and assert that good cause exists to grant such request.

1.     **Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude Evidence**
            **of Speculation Regarding Lenders' Future Plans Concerning the Subject Mortgages**

In opposition to Plaintiffs' Motion *in Limine*, IMGA does not offer anything to dispute

that this "evidence" is: (1) pure speculation; (2) irrelevant; and (3) whatever probative value it

may have is substantially outweighed by its unfair prejudice.   It is clear from IMGA's

opposition, however, that it still intends to pursue this issue at trial.   Moreover, IMGA's

opposition does not do anything to rebut the fact that testimony on this issue serves no purpose other than to unfairly imply to the jury that the Plaintiffs may be able to eliminate their outstanding indebtedness to the banks when they have a legally binding obligation to the bank for the full amount of the loans.

In its opposition, IMGA first agrees that "what the lenders will do *in the future* with respect to Plaintiffs' mortgages is 'pure speculation.'"  (D.E. 223 at 1 (emphasis added).) IMGA's opposition disregards, however, that *at the present time*, each Plaintiff is legally indebted to their lenders for the full amount of the purchase loans and there is no evidence demonstrating that this fact is likely to change.  Of course, simply labeling the debt as a "speculative future loss" does not make it disappear.  As previously noted, no lender has agreed to forgive the indebtedness of any of the Trial Group Plaintiffs under a deed-in-lieu or other debt forgiveness mechanism.  In simple terms, IMGA has not offered anything to show that these Plaintiffs will not have to repay their loans.

IMGA next responds that notwithstanding Plaintiffs' claim that they have a legally binding obligation to the bank, "it is undisputed that Plaintiffs are not currently making any of their mortgage payments."  (*Id.* at 1.)  Here, IMGA conveniently disregards the fact that these Plaintiffs have only been allowed to postpone such payments during the pendency of this litigation.  Additionally, IMGA overlooks the various consequences of any Trial Plaintiffs failure to repay these loans and disregards the substantial interest and penalties associated with the loans.

IMGA also argues that even if Plaintiffs recover in this case, they may or may not use their damages to repay their loan obligations even though they would still be liable for such loans.  IMGA's argument here is irrelevant and as speculative as what the banks may or may not

do with respect to these loans.  IMGA also misrepresents certain Plaintiffs' testimony on this

point.  To be fair, Mr. Amit Bakshi testified as follows:

> Q.     One way or the other, you plan to use any money that you get from this
> case to satisfy the bank, to satisfy your obligation to the bank, whether it is
> the full amount or a reduced amount that you're able to negotiate, is that
> right?
>
> A.     Yes.

(*See* D.E. 215, Exhibit 12 at 134.)  Similarly, Mr. Ron Kooyman testified as follows:

> Q.     If you recover money in this case, what is your intention with respect to
> using that money to pay off the mortgages you use[d] to acquire these
> properties?
>
> A.     My intention would be to get out from underneath these mortgages whole
> without any damage to my credit, for sure.  That would be primary.  That
> is primary.
>
> Q.     And one way to do that would be to pay the mortgage off in full, right?
>
> A.     I would think so.

(*See* D.E. 215, Exhibit 13 at 171-72.)[1]

    In its opposition, IMGA does not point to any authority for the proposition that a valid,

enforceable loan cannot be considered damages.  *Contra Quintana v. Countrywide Home Loans,*

*Inc.*, Case No. 09-20427-CIV-ALTONAGA/Brown, slip op. at 16 (S.D. Fla. May 26, 2009)

(D.E. 26) (denying a motion to dismiss plaintiff's FDUTPA claim where the plaintiff allegedly

suffered the damage of being saddled with a mortgage beyond her means).  IMGA even

questioned Plaintiffs' damages expert, Mr. Michael F. O'Rourke, a CPA, on whether Plaintiffs

will satisfy one-hundred percent of their mortgage balance, and Mr. O'Rourke candidly admitted

---

[1] IMGA also dismisses Plaintiffs' discussion of the history of this litigation concerning the issue as "beside the point," yet the history of this issue shows that IMGA originally planned to bring this testimony in through their "rebuttal" expert but could not because it was not proper rebuttal testimony.  IMGA was then forced to stipulate that its expert would not testify as to these issues.  Now, IMGA is trying to introduce this testimony where there is no basis to do so.

that he "can't testify as to what will happen *in the future* by the plaintiffs." (D.E. 215, Exhibit 2 at 156 (emphasis added).) Of course, nobody can predict the future, but that is apparently what IMGA insists Plaintiffs must do to recover their damages in this case. Under IMGA's theory of recoverable damages, all damages would effectively be considered speculative future losses because there is no certainty as to what the future holds.

Even the cases cited by IMGA do not support its argument. *See, e.g., McCloud v. Sherman Mobile Concrete Co., Inc.*, 579 So. 2d 773, 774 (Fla. 2d DCA 1991) (reversing the trial court where there was no credible evidence to contradict the evidence that the plaintiff sustained injuries). Similarly, IMGA has offered "no credible evidence to contradict" that the Trial Plaintiffs have sustained damages. IMGA also claims that notwithstanding all of the foregoing, evidence of Plaintiffs' current loan status and negotiations with lenders is relevant to the jury's determination that Plaintiffs have met their legal burden to establish damages. Here, IMGA is essentially asking this Court to permit them to argue that Plaintiffs may not eventually have to repay their loans when there is no support for such argument for the First Trial Group. Accordingly, this is a prototypical scenario for which a motion *in limine* is intended because testimony on this issue serves no purpose other than to unfairly imply to the jury that the Plaintiffs may be able to eliminate their outstanding indebtedness to the banks when there is no support for this conclusion.

2.     **Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude Evidence and Argument Relating to the Trial Plaintiffs' Alleged Mortgage Fraud**

Based on IMGA's opposition, it is clear that IMGA intends to argue that the Plaintiffs committed mortgage fraud to poison the well and divert attention away from its own wrongdoing. However, any argument or testimony regarding mortgage fraud should not be introduced at trial because: (1) IMGA cannot use this testimony to demonstrate either unclean

hands or *in pari delicto* (*see* D.E. 207 at 4-9.); (2) mortgage fraud is not a defense to FDUTPA

claims (*see id.*); (3) the introduction of Plaintiffs' alleged conduct to impeach their general

credibility is not permitted under Rule 608(b); and (4) even if considered marginally relevant, the

probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

In its opposition, IMGA first argues that mortgage fraud is "inextricably intertwined with

the evidence of the underlying condo purchase transaction at issue and goes directly to the

credibility of each Plaintiff on the core issue of their reasons for making the purchase."   (D.E.

223 at 3.)   Although this argument has superficial appeal, it does not pass muster under close

scrutiny.   Under IMGA's theory, whether each Plaintiff cheated on a high school history exam

would also be pertinent to the Plaintiffs' credibility.

IMGA is permitted to cross-examine Plaintiffs on matters affecting their credibility, but

Federal Rule of Evidence 608(b) prohibits a party from introducing extrinsic evidence of prior

misconduct merely to impeach the general credibility of a witness.   *See* Fed. R. Evid. 608(b).   In

fact, extrinsic evidence of a witness's prior misconduct should be excluded where that evidence

is only probative of the witness's general propensity for truthfulness; such evidence should be

admitted, however, where it is introduced to disprove a specific fact material to the case.   *See*

*United States v. Calle*, 822 F.2d 1016, 1021 (11th Cir. 1987) (*citing United States v. Opager,* 589

F.2d 799, 801 (5th Cir. 1979)); *United States v. Aponte*, 31 F.3d 86, 88 (2d Cir. 1994) (holding

that a written sworn statement containing fabrications was "extrinsic evidence" under Rule

608(b) and was properly excluded where "offered to show [witness's] capacity for deception");

*Buckley  Towers Condominium, Inc. v. QBE Ins. Corp.*, No. 07-22988-CIV, 2008 WL 5505415,

at *8 (S.D. Fla. Oct. 21, 2008) (finding that an application signed by the witness was extrinsic

evidence).

Although documents may be admissible on cross-examination to prove a material fact, they are not admissible under Rule 608(b) merely to show a witness's general character for truthfulness or untruthfulness.  *See United States v. Elliot*, 89 F.3d 1360, 1368 (8th Cir. 1996) (noting that the reason for barring extrinsic evidence is to avoid holding mini-trials on peripherally related or irrelevant matters); *United States v. Simmons*, 444 F. Supp. 500, 507 (E.D. Pa. 1978) (finding that the testimony was precisely the type Rule 608(b) excludes to avoid mini-trials on wholly collateral matters which tend to distract and confuse the jury).

A party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter. *United States v. Andujar*, 49 F.3d 16, 26 (1st Cir. 1995) (stating that it is well settled that a party may not present extrinsic evidence of specific instances of conduct to impeach a witness on a collateral matter and finding that the incident was only relevant to impeach the credibility of the witness and was irrelevant to the substance of the case). Moreover, a matter is considered collateral if the matter itself is not relevant to the litigation to establish a fact of consequence.  *Id.*; *United States v. Schuler*, 458 F.3d 1148, 1155 (10th Cir. 2006) (noting that a matter is collateral if it could not have been introduced in evidence for any purpose other than impeachment); *Simmons*, 444 F. Supp. At 507 (stating that the purpose of Rule 608(b)'s extrinsic evidence ban is "to avoid minitrials on wholly collateral matters which tend to distract and confuse the jury"); *Jones v. S. Pac. R.R.*, 962 F.2d 447, 450 (5th Cir. 1992) (noting that there is no right to impeach a witness with respect to collateral matters or irrelevant matters).[2]

---

[2]It should also be noted that in reviewing the curtailment of cross-examination or the admissibility of extrinsic evidence to attack the credibility of a witness, a reviewing court must determine whether the district judge acted within the large measure of discretion accorded by Rule 403 and 608(b).  *United States v. Calle*, 822 F.2d 1016, 1020 (11th Cir. 1987).

Here, evidence relating to whether the Plaintiffs committed mortgage fraud has no bearing on whether Plaintiffs were deceived by IMGA into purchasing the units. In other words, the manner in which the Plaintiffs obtained the money for their investments is irrelevant and has no connection to whether Plaintiffs were deceived by IMGA. *See Baranski v. Serhant,* No. 82 C 6611, 1985 WL 65, at *1-2 (N.D. Ill. Sept. 20, 1985) (finding the defendant's arguments were without merit where the plaintiff had argued that the source of the funds was irrelevant). Other than conclusory allegations, IMGA does not explain how the evidence related to mortgage fraud is "inextricably intertwined" with the evidence relating to Plaintiffs' FDUTPA case. Moreover, there is no clear nexus between the reasons Plaintiffs allegedly gave *to their lenders* to purchase their units (*i.e.* their financial status and use as a second home) and the reasons why they were deceived by IMGA in purchasing the units. Plaintiffs purchased these units based on the representation that IMGA was involved and would develop the project, and Plaintiffs can be cross-examined on that issue. Even assuming that this evidence is marginally relevant, which it is not, its probative value in a FDUTPA case is substantially outweighed by its danger of unfair prejudice.

Although IMGA claims that each Plaintiff misrepresented to their lenders their reasons for purchasing the units, the evidence demonstrates that Plaintiffs were in fact steered to "preferred lenders" and particular mortgage brokers to obtain financing for the units. (D.E. 207 at 2.) In fact, the loan application process took place over the telephone where Plaintiffs accurately relayed their income and asset information to their broker. (*Id.*) Most importantly, none of the Plaintiffs personally filled out their loan application, relying instead on their broker to complete the applications. (*Id.*) Many Plaintiffs did not even see the completed application until the loan was approved, and they were asked to sign the document. Thus, it is no surprise

that Plaintiffs have not been accused of fraud by their lenders, and no Plaintiff has been charged with a federal crime.  (*Id.*)  At best, Plaintiffs are responsible for not completely reviewing each and every imbedded clause in their voluminous mortgage documentation packages.  Yet, IMGA now argues that this information should be considered in deciding whether the Plaintiffs are credible individuals.

IMGA cannot show, however, that the conduct it points to relates to Plaintiffs' FDUTPA claims instead of collateral, antecedent transactions.  (D.E. 207 at 5 (citing cases).)  Whether the Plaintiffs were guilty of misconduct in separate transactions with their lenders is not, no matter how much IMGA wants it to be, the matter in litigation.  (*Id.*)  Here, the mortgage applications, Second Home Riders, and leaseback agreements are not in controversy.  In fact, the banks wanted this sold as a package and no bank has complained or even been deposed in this action.  Accordingly, whether the banks would have lent money if there was no Second Home Rider is sheer speculation.

There is evidence, however, that the Plaintiffs would have been given these loans notwithstanding the Second Home Rider.  For example, Patricia French, one of the Trial Group Plaintiffs (1) did not even sign the Second Home Rider; (2) expressly represented that this was an investment property; (3) had a loan application which was accurate to the penny; and (4) her loan application was still approved for ninety percent of the purchase price.  Although IMGA concedes that Ms. French did not commit mortgage fraud (D.E. 172 at 5), her loan was approved despite having the lowest income and assets of any Plaintiff and the fact that she did not even sign the Second Home Rider.

IMGA also argues that Plaintiffs cannot claim damages based on the loans they obtained to purchase the units and then preclude evidence on those matters.  Although IMGA cites *United*

*States v. Shepard*, 154 F. App'x 849, 851 (11th Cir. 2005), *Shepard* is a criminal case where the court noted that all of the records "involved conduct that arose out of the same series of transactions as the charged offense, were necessary to complete the story, were inextricably intertwined with the evidence, and were not unduly prejudicial."  As noted above, however, evidence regarding mortgage fraud is distinct from Plaintiffs' FDUTPA claims in this case, is not necessary to determine whether IMGA deceived Plaintiffs into purchasing these units, is not inextricably intertwined with the evidence regarding FDUTPA violations, and any probative value it has is substantially outweighed by the danger of unfair prejudice.  Although IMGA wants to use this information "to tell the jury the full story," it is clearly irrelevant to any claims in the case and is only offered for prejudicial purposes.

IMGA also claims that Plaintiffs' statements regarding the dramatic increase to the length of the trial are overblown.  IMGA even argues that "mortgage fraud proof is extremely simple and straightforward" requiring only a "handful of documents."  (D.E. 223 at 7.)  IMGA may hope that Plaintiffs' would only defend such serious allegations in a cursory manner, but, like IMGA, Plaintiffs would also have "to tell the jury the full story" about the circumstances of obtaining their mortgages and introduce all of the relevant documents (including the financial documents, authorizations, and documents supporting their income and assets) as well as all relevant witnesses (including the various mortgage brokers who completed the mortgage applications on behalf of the Plaintiffs and the representatives from the various lenders).  *See Anderson v. WBMG-42*, 253 F.3d 561, 567 (11th Cir. 2001) (affirming exclusion of evidence pursuant to Rule 403 on collateral matter where such evidence would have resulted in a lengthy cross-examination and perhaps lengthier rebuttal, resulting in a mini-trial).[3]  Obviously,

---

[3] The cases cited by IMGA on this point are of no assistance to IMGA as they dealt with issues that were necessary to the underlying action. *See, e.g., Buenoano v. Dugger*, No. 90-473-CIV-ORL-19, 1990 WL 119637, at *10 (M.D.

individual mortgage fraud trials for all of the Trial Plaintiffs would not be as simple an undertaking as IMGA suggests and would only confuse the jury and unnecessarily delay and prolong the trial.

Finally, IMGA asserts that the term "mortgage fraud" is not inflammatory, but IMGA's argument here only reflects its true intentions with respect to this issue.  Indeed, arguing that the Plaintiffs committed mortgage fraud implies that these Plaintiffs are criminals who have committed a federal crime.[4]   If IMGA's argument is truly directed at the Plaintiffs' credibility, then surely IMGA would have no problem agreeing that Plaintiffs simply signed mortgage applications in which their brokers allegedly misrepresented certain information.  Yet, IMGA's unwillingness to even concede this point demonstrates the true intent of their opposition.

**3.      Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude All Evidence and Argument Relating to Leaseback Payments**

###### A.  Evidence of Leaseback Payments are Not Relevant to IMGA's Liability

As it relates to the First Trial Group, Plaintiffs agree that all but one Plaintiff received leaseback payments.  Accordingly, for purposes of the First Trial Group, Plaintiffs stipulate that the leaseback program did not constitute a deceptive or unfair trade practice.  In fact, Plaintiffs do not intend on mentioning the leasebacks at any point during the trial.  Thus, IMGA's argument that it needs to present evidence of the leasebacks to demonstrate that its conduct was

---

Fla. June 22, 1990) (finding that the amount of trial time spent on the similar acts evidence *was necessary* in order to allow the jury to determine whether petitioner was responsible for those similar acts) (emphasis added), *vacated*, 963 F.2d 1433 (11th Cir. 1992).

[4]IMGA's claim that Plaintiffs' lenders have accused them of mortgage fraud is false.  Even a cursory review of the exhibit IMGA references on this issue demonstrates that it only reflects Plaintiffs' failed attempts to work something out with the banks.  (*See* D.E. 223, Exhibit 2 (stating that "we will continue to enforce the Note that was signed by your clients and proceed with normal collection activities").  Again, no Plaintiff has been accused of fraud by their lender, and no Plaintiff has been charged with a crime.  (D.E. 207 at 2.)   Additionally, this case is clearly distinguishable from the case IMGA cites on this issue where the inflammatory phrase permitted was merely "go-fast" in reference to a type of boat, as opposed to the inflammatory phrase here of "mortgage fraud."  *See United States  v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002).

not deceptive is inapplicable to refute any theory of the case because Plaintiffs will not present evidence or argument that the leasebacks are the subject of deceptive conduct.

IMGA also argues that the leaseback agreements are "directly relevant to the issue of Plaintiffs' mortgage fraud." (D.E. 223 at 9.) Plaintiffs object to this assertion and rely on their arguments regarding mortgage fraud in section 2, *supra*.

### B. Evidence of Leaseback Payments are Not Relevant to FDUTPA Damages

IMGA argues that the leaseback payments are relevant to Plaintiffs' damages because they are part of what Plaintiffs "received" after they closed on the units. (*See* D.E. 223 at 10.) First, the only reason why Plaintiffs' damages expert, Mr. O'Rourke, recalculated his damages in the November 13, 2009, report is because IMGA insisted that the proper measure of damages was not the *current* value of the units, but rather the value at *closing*. Plaintiffs agreed with IMGA, and Mr. O'Rourke recalculated Plaintiffs' damages to reflect the difference between the purchase price each Plaintiff paid at *closing* (representing the value of the unit in the condition it should have been delivered based on the marketing and advertising materials) and the value of each Plaintiff's unit in the condition it was delivered at *closing*. IMGA cannot argue that the value of the units after closing is irrelevant and then argue that agreements executed over one month after closing, *i.e.* the leaseback agreements, are relevant.[5]

Second, the problem with IMGA's theory, as a matter of law, is that it is limitless and substantively changes FDUTPA law. Taking IMGA's argument to its logical conclusion, Plaintiffs' consequential and out-of-pocket expenses should be just as important to the damages calculations as the "benefits" Plaintiffs "received" after closing. For example, Plaintiffs incurred

---

[5] Despite what Plaintiffs alleged in their Complaint, discovery has established that the leasebacks were not executed until more than one month after closing. For example, Plaintiff Alan Chan closed on his unit on November 22, 2006, but he executed the lease agreement on January 3, 2007. (*See* Exhibit 1: Purchase Sale Agreement at CHAN 00021; Exhibit 2: Leaseback Agreement at CHAN 00042.)

various expenses after closing, such as closing costs, insurance, taxes, and condo association fees. Even renovations should work to increase Plaintiffs' damages. Yet, IMGA excludes these expenses from any damages consideration. (D.E. 212, Exhibit 8 at 6 (excluding "the Membership Fees from [damages] calculation . . . [because] those fees relate exclusively to services provided by Cay Clubs, an unnamed party in this litigation.").) These expenses, like the leaseback payments, are irrelevant to FDUTPA damages because they are consequential to IMGA's deceptive conduct and are not recoverable, as a matter of law, on the value of the units as the units were delivered to Plaintiffs at closing.[6] *Cf. Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati*, 715 So. 2d 311, 314 (Fla. 4th DCA 1998) (holding that consequential and out-of-pocket losses incurred as a result of the deceptive trade practice are not recoverable under FDUTPA). If consequential and out-of-pocket losses are not relevant to FDUTPA damages, then consequential and "out-of pocket" monies received are also not relevant to Plaintiffs' damages.

In this case, Plaintiffs only seek to recover the cost of IMGA's deceptive conduct. As stipulated above, the leasebacks are not the subject of IMGA's deceptive conduct. Accordingly, damages should be computed based upon IMGA's partnership with Cay Clubs in deceiving Plaintiffs into paying full price for a five-star resort with an IMGA sports training facility that was never delivered. "Delivery" for purposes of FDUTPA means the value of what Plaintiffs received at the time at closing and includes the fact that the IMGA sports facility was not and has never been "delivered." By contrast, the leasebacks were executed after closing, were executed with a different entity, and are simply irrelevant to the cost of IMGA's deceptive conduct that Plaintiffs seek to recover.

---

[6] Alternatively, if this Court finds that the leasebacks should be considered as part of Plaintiffs' damages, Plaintiffs reserve the right to allege closing costs, insurance, taxes, and condo association fees as part of their damages.

IMGA's reliance on *General Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276 (Fla. 4th DCA 1998), is misplaced.  First, the Fourth District specifically noted that its discussion on damages was "dicta."  *Id.* at 278.  Second, the damages calculations applied in *Laesser* involved the difference between the plaintiff's cost to purchase a vehicle outright and the plaintiff's cost to purchase the vehicle by lease-purchase.  *Id.*  Under both scenarios, the court specifically looked to the purchase date as the appropriate method of determining the "delivery" date.  Accordingly, evidence of leaseback payments is not relevant to FDUTPA damages and should be excluded.

**4.     Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude All Evidence and Argument Relating to IMGA's "Good Faith"**

IMGA agrees with Plaintiffs that a fact is relevant only when it is "an issue that is necessary to a verdict . . . . [i.e.,] it is of consequence to the determination of the action."  (D.E. 223 at 12 (citing 12 Fed. Proc., L. Ed. § 33:108)).  However, IMGA then argues that its good faith is relevant to refute Plaintiffs' allegations that its conduct was deceptive.  IMGA fails to provide any basis in law to support this argument.  Indeed, IMGA did not even attempt to contradict the case law cited by Plaintiffs, which clearly rejects IMGA's contention that its good faith is relevant to a FDUTPA analysis.  (*See* D.E. 212 at 11-12.)

The Eleventh Circuit has previously rejected the same argument IMGA now raises.  *Orkin Exterminating Co. v. Fed. Trade Comm'n*, 849 F.2d 1354, 1368 (11th Cir. 1988).  In *Orkin*, Orkin challenged a finding that its practice of increasing its annual renewal fees was unfair and deceptive under the Federal Trade Commission Act ("FTCA").[7]  *Id.* at 1368.  Orkin argued that the finding was error because the Commission refused "to consider evidence that it relied, in good faith, upon advice of counsel."  *Id.*  The Eleventh Circuit rejected this argument,

---

[7] "FDUTPA specifically notes that 'due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts.'"  *Bavaro Palace, S.A. v. Vacation Tours, Inc.*, 203 F. App'x 252, 256-57 (11th Cir. 2006) (quoting § 501.204(2), Fla. Stat.).

explaining that "[t]he unfairness standard, focusing as it does upon consumer injury, does not take into account the mental state of the party accused of [violating the FTCA]." *Id.* Indeed, "proof of a party's intent has no bearing on the question whether [an FTCA] violation has occurred." (*Id.* (citations omitted).) This is so because "a practice may be deceptive without a showing of intent to deceive . . . [or that] the offending party intended to cause consumer injury." Like *Orkin*, IMGA's good faith "is simply not germane to the question whether [IMGA's] conduct was unfair within the meaning of [FDUTPA]." *See id.*; *see also Inter-Tel, Inc. v. W. Coast Aircraft Eng'g*, No. 8:04CV-02224-T-17MSS, 2006 WL 3335050, at *9 (M.D. Fla. Nov. 16, 2006) (noting that defendant "has provided nothing to suggest that acting in good faith would, as a matter of law, defeat a claim under the Florida Deceptive and Unfair Trade Practices Act").

IMGA claims that its "good faith" is "directly relevant to certain specific elements" of Plaintiffs' FDUTPA claim. IMGA then cites to its summary judgment papers and summarily argues that "to prove that IMGA made a deceptive statement regarding the future development of the property, Plaintiffs must demonstrate, *inter alia*, that IMGA knew that the future development would not be fulfilled at the time of the alleged deceptive statement of future performance." (D.E. 223 at 12 (citing D.E. 210 at 5 (IMGA's Reply Brief in Support of its Motion for Summary Judgment)).) IMGA grounded this argument in its summary judgment motion by analogizing to *University of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450 (11th Cir. 2006). As Plaintiffs explained in their response to IMGA's motion for summary judgment, *Intuitive Surgical* "makes no mention of a 'good faith' defense, and the decision was based on the fact that there was no deception at all. No deception is not the same as unintended deception." (D.E. 203 at 11.) Moreover, *Alexander/Davis Properties, Inc. v. Graham*, 397 So.

14

2d 699, 706 (Fla. 4th DCA 1981), which IMGA cited in its summary judgment reply brief, involved a claim of fraud, which specifically includes an element of the defendant's knowledge of misrepresentation.  Unlike fraud, FDUTPA does not consider a defendant's intent to deceive.[8]

IMGA's reliance on *Jeter v. St. Regis Paper Co.*, 507 F.2d 973 (5th Cir. 1975), is also misplaced.  IMGA cites *Jeter* for the proposition that Plaintiffs cannot make certain allegations and then preclude IMGA from refuting those allegations.  *Jeter* involved assertions that the plaintiff made *during trial*.  *Id.* at 979.  IMGA is certainly free to rebut any assertions Plaintiffs make at trial with relevant evidence.  Like *Orkin*, however, IMGA's good faith "is simply not germane to the question whether [IMGA's] conduct was unfair within the meaning of [FDUTPA]."  849 F.2d at 1368.  Accordingly, evidence and argument relating to IMGA's good faith should be excluded.

5.    **Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude the Expert Opinions of Louis G. Dudney**

In its opposition, IMGA claims that Mr. Dudney's rebuttal report and supplemental report respond to and criticize the assumptions and methodology of Plaintiffs' expert and constitute "'classic rebuttal expert testimony.'" (D.E. 223 at 13.)  Plaintiffs do not dispute that IMGA can offer rebuttal expert testimony that attempts to rebut, repel, counteract, or disprove Plaintiffs' expert testimony.  However, when that rebuttal testimony is based upon a flawed methodology and then includes an independent assessment of damages based on that flawed methodology, the rebuttal testimony is inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

---

[8] At one point in this action, when Plaintiffs alleged civil theft, IMGA's intent was relevant.  *See Lewis v. Heartsong, Inc.*, 559 So. 2d 453, 545 (Fla. 1st DCA 1990) (finding that intent is a necessary element to civil theft).  However, the fact that Plaintiffs simplified the issues for trial by abandoning their civil theft claim should not, as a matter of law, permit IMGA to raise issues that are only relevant to abandoned claims.

IMGA claims that Mr. Dudney simply rebuts each of Mr. O'Rourke's calculations by "following the same framework," but a review of Mr. Dudney's reports demonstrates that he actually performed an analysis that does not comport with FDUTPA and that is quite different from Mr. O'Rourke's analysis.  Additionally, IMGA claims that Mr. Dudney made "appropriate adjustments," but such adjustments only summarily excluded certain factors, without adequate explanation, that should properly have been included under FDUTPA.  Although IMGA claims that in each of Mr. Dudney's rebuttal reports, he "corrects Mr. O'Rourke's calculations by approving or disapproving of Mr. O'Rourke's exclusion or inclusion of various factors in his calculations" (D.E. 223 at 15), Mr. Dudney used a flawed methodology to come up with a flawed assessment of damages in this case (*i.e.* the "corrected O'Rourke" calculation).

With respect to Mr. Dudney "following the same framework," IMGA claims that he merely excludes the losses caused by the decline in the Orlando real estate market.[9]  IMGA explains that for the market value of the unit in the condition in which it should have been delivered (*i.e.* "A"), he took the purchase price of the units, excluded the mandatory membership fees, subtracted the loss caused by the Orlando real estate market, and then subtracted the leasebacks.  Of course, the devil is in the details here as IMGA fails to explain that to calculate the "loss caused by the Orlando condo decline," he multiplied the overall market decline by the purchase price of each unit, which represented a five star resort with world class amenities.  As explained by Mr. O'Rourke, this is improper because it allows IMGA to take advantage of the

---

[9] IMGA claims that Mr. Dudney calculated the value of what Plaintiffs should have received, but a review of his first report reflects no such value.  Although Mr. Dudney claims that certain calculations in his supplemental report constitute the value of the unit in which it should have been delivered and the value of the unit in which it was actually delivered, it is apparent that Mr. Dudney was only belatedly trying to fit his analysis into the FDUTPA framework.

increased value of a fully renovated and developed unit when that never occurred.  (*See* D.E. 212, Exhibit 1 at 116-17, 168-69.)

With respect to Mr. Dudney's "appropriate adjustments," he summarily excluded the mandatory membership fees paid by Plaintiffs "based on [his] understanding that those fees relate exclusively to services provided by Cay Clubs."  (D.E. 212, Exhibit 4 at 9.)  Even assuming that the mandatory membership fees related to services, the membership fees should be included in the "what you should have received" calculation because this was part of the total purchase price of the units.  Mr. Dudney also excludes the leasebacks from his calculations as an "appropriate adjustment" even though as explained in Plaintiffs' Motion *in Limine* to Exclude All Evidence and Argument Relating to Leaseback Payments (D.E. 212 at 9), the leasebacks are irrelevant to an appropriate measure of damages under FDUTPA with a delivery date at the time of closing.  Finally, Mr. Dudney uses this flawed methodology to determine that the total FDUTPA damages are $902,000.  (D.E. 223 at 15.)

Contrary to IMGA's assertions, Plaintiffs do not criticize Mr. Dudney for attempting to exclude the decline in the Orlando real estate market.  In fact, in Mr. O'Rourke's report dated November 13, 2009, Plaintiffs account for the Orlando real estate decline in their damages analysis.  As explained above, however, Plaintiffs do criticize Mr. Dudney for the manner in which he excluded that decline in his FDUTPA analysis.  Although IMGA claims that Plaintiffs are somehow better off now than before based on what they actually paid versus what they received, it should be noted here that Plaintiffs' damages in this case do not even include the substantial interest and penalties associated with their loans.  In sum, Mr. Dudney's reports do not follow a proper measure of damages under FDUPTA, and they include an improper

assessment of damages based on that flawed methodology.   Accordingly, Mr. Dudney's testimony should be excluded in its entirety under *Daubert*.

6.    **Plaintiffs' Reply in Further Support of Their Motion *in Limine* to Exclude Evidence of IMGA's Profits/Losses from the Orlando Cay Club Resort and Academy Venture**

IMGA argues that its profits/losses on the Orlando Cay Club Resort and Academy Venture are relevant because Plaintiffs have put the disposition of their purchase monies "at issue." The disposition of Plaintiffs' monies was only relevant to Plaintiffs' civil theft claim, which Plaintiffs abandoned. To establish a claim for civil theft, a plaintiff must prove that the defendant "obtain[ed] or use[d]" plaintiff's monies. § 812.014(1), Fla. Stat; *United Technologies Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (explaining elements of Florida's civil theft statute). However, Plaintiffs have since abandoned their civil theft claim. The fact that Plaintiffs here simplified the issues for trial by abandoning their civil theft claim should not, as a matter of law, permit IMGA to raise issues that are only relevant to abandoned claims. Indeed, if IMGA argues that Plaintiffs should not "resurrect abandoned claims," as it did in its Motion *in Limine* No. 5, (D.E. 215 at 42-43), then IMGA should not itself "resurrect" those claims by presenting evidence that is only relevant to abandoned claims. Indeed, when reviewing IMGA's response to Plaintiffs' Motion *in Limine* on this issue, it is clear that IMGA has completely failed to explain how its profits/losses are even remotely relevant to any element of Plaintiffs' claim, the defenses IMGA has proffered, the measure of damages, or the credibility, bias or prejudice of any witnesses. Accordingly, Plaintiffs' motion to exclude evidence of IMGA's profits/losses from the Orlando Cay Club Resort and Academy venture should be granted.

7.    **Plaintiffs' *Supplemental* Response to IMGA's Motion *in Limine* No. 3: To Preclude Certain Irrelevant and Unreliable Opinions of Kelly Johnson**

On January 25, 2010, Plaintiffs filed their Response to IMGA's Motion *in Limine* No. 3: To Preclude Certain Irrelevant and Unreliable Opinions of Kelly Johnson. (D.E. 226). Recently, Plaintiffs learned of pertinent information which should necessarily be included in that response.

19

Plaintiffs are submitting this information as a "supplemental response," rather than waiting to file a sur-reply, so that IMGA has adequate time before the hearing on February 9, 2010, to consider such information.  Accordingly, pursuant to Local Rule 7.1.C., Plaintiffs respectfully request leave to file the supplemental response below and assert that good cause exists to grant such request.

Plaintiffs have recently learned that the appraiser who performed most of the improper appraisals referenced in Mr. Johnson's report, Joseph M. Goenner, Jr., has been the subject of an administrative complaint filed by the Florida Department of Business and Professional Regulation, Florida Real Estate Appraisal Board, for his appraisal work on the Orlando Cay Clubs Resort and Academy project.  The complaint, titled "*FDBR v. Joseph M. Goenner, Jr.*, Case No. 2008031413," accuses Mr. Goenner of committing numerous "errors and omissions" in regard to an appraisal performed at the Orlando project, including: (1) using improper comparables; (2) failing to analyze and report the prior sales history for the subject property; and (3) failure to explain or analyze "upgrades" throughout the appraisal report.  The complaint asserts that Mr. Goenner is: (1) guilty of having failed to exercise reasonable diligence in developing an appraisal report in violation of Section 475.624(15), Florida Statutes; and (2) guilty of violating the Uniform Standards of Professional Appraisal Practice in violation of Section 475.624(14), Florida Statutes.  Although there has not yet been a final disposition of the administrative complaint, it is currently in settlement negotiations.  Accordingly, Plaintiffs respectfully request leave to supplement their response, filed on January 25, 2010 (D.E. 226), with this pertinent information.

Dated: This 1st day of February, 2010.

Respectfully submitted

KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon Blvd., 9th Floor
Coral Gables, Florida  33134
Tel: 305-372-1800 / Fax: 305-372-3508

By:   s/ Adam M. Moskowitz
    Harley S. Tropin, Esq. (Fla. Bar No. 241253)
    Adam M. Moskowitz (Fla. Bar No. 984280)

And

James B. Tilghman, Jr., Esq.
STEWART TILGHMAN FOX & BIANCHI, P.A.
One Southeast Third Avenue, Suite 3000
Miami, Florida  33131
Tel:  305-358-6644 / Fax: 305-358-4707

And

Keith T. Belt, Esq. / Chris Cantrell, Esq.
BELT LAW FIRM, P.C.
Lakeshore Park Plaza, Suite 208
2204 Lakeshore Drive
Birmingham, AL 35209
Tel: 205-933-1500 / Fax: 205-933-5500

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on February 1, 2010, a true and correct copy of the foregoing has been served on all counsel of record via Notices of Electronic Filing generated by the CM/ECF system.

By:   s/ Adam M. Moskowitz

309226v.1