UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 08-62076-CIV-ALTONAGA/McAliley

WALTER GASTALDI, *et al.*,

      Plaintiffs,

vs.

SUNVEST RESORT COMMUNITIES, LC,
*et al.*,

      Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on the Defendant, IMG Academies LLP's Motion for

Summary Judgment (the "Motion") [D.E. 171], filed November 17, 2009.  The Court has carefully

considered the parties' submissions, oral arguments presented on January 7, 2010, and the applicable

law.

## I.  BACKGROUND

The Plaintiffs are thirty-three[1] self-described working people from across the United States

who learned of an opportunity in 2006 and 2007 to invest in the Orlando Cay Clubs Resort and

Academy ("Orlando Cay Clubs" or "Project").  According to marketing and promotional materials,

Orlando Cay Clubs was to be turned from an apartment complex and a golf course into a five-star

resort community with high-end luxury condominiums and a state-of-the-art sports facility.  Cay

Clubs International, LLC ("Cay Clubs"), and the Defendants, Sunvest Resort Communities, LC,

---

[1] According to the Second Amended Complaint, there are approximately 270 Plaintiffs in all.  For
case-management purposes, only thirty-three have been designated for an initial trial.  (*See* May 15, 2009
Order [D.E. 73] ¶ 2).

Sunvest's subsidiaries and affiliates, and IMG Academies, LLP ("IMGA"), allegedly marketed themselves as partners in the development of the Project. Literally buying into these representations, each Plaintiff paid on average $350,000 for a unit in the apartment complex believing it would be converted and a sports facility would be built. But in late 2007, Cay Clubs, along with the rest of the real-estate market in Florida, collapsed, and Sunvest, its subsidiaries and affiliates, and IMGA abandoned the Project — and the Plaintiffs were not refunded their money. The Plaintiffs allege the Defendants, contrary to their representations, "didn't follow through with the restoration of [the Project], the conversion or the sporting facility" (Colburn Dep. 99:15–17, July 21, 2009), leaving the Plaintiffs with "un-refurbished residential units in a low-end abandoned moldy bug and rodent infested apartment complex" (Second Am. Compl. [D.E. 188] ¶ 242).[2] In this lawsuit, the Plaintiffs allege the Defendants, in connection with the marketing and promoting of Orlando Cay Clubs, used deceptive-and-unfair trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA" or the "Act"), §§ 501.201–501.213, Florida Statutes.

**A.      IMG Academies, LLP**

Located in Bradenton on the Gulf Coast of Florida, IMGA is a sports-training-and-educational company offering full- and part-time educational programs and sports instruction to student, amateur, and professional athletes. (*See* Def.'s Statement of Undisputed Material Facts [D.E. 173] ("DSOF") ¶ 1. IMGA has trained tennis stars such as Maria Sharapova, Monica Seles, and Andre Agassi, as well as the likes of New York Giants quarterback Eli Manning, professional golfer Paula Creamer, and Denver Nuggets guard (and 2004 NBA finals MVP) Chauncey Billups.

---

[2]  The apartment complex was later renamed "The Greens."  (Second Am. Compl. ¶ 227).

Case No. 08-62076-CIV-ALTONAGA/McAliley

(*See id.* ¶ 2).  IMGA's Bradenton campus is home to the Nick Bollettieri Tennis Academy and the David Leadbetter Golf Academy.  Because of these and other academies, as well as its impressive record training elite athletes, IMGA has promoted itself as the "premier multi-sport training facility in the world."  (Pls.' Statement of Material Facts ("PSOF") [D.E. 205] ¶ 3).  Indeed, "[w]hen it comes to size, scope and star power, IMG Academies . . . has no peer."  Kelley King, *The Ultimate Jock School*, Sports Illustrated, Nov. 25, 2002, at 48.

IMGA, which had collaborated with Cay Clubs on real-estate projects before, became involved in Orlando Cay Clubs in 2006.  In October IMGA entered into a consulting agreement with DC720JV, LLC ("DC720JV"), an "affiliate" of Cay Clubs, according to which DC720JV would develop a residential-resort complex that would include a field-sports complex.  (*See* DSOF ¶ 4).  The consulting agreement, which defined IMGA's role in the Project as a sports-training consultant, required IMGA to provide "advice and guidance regarding the design, establishment, management and operation of the Sports Complex."  (*Id.* ¶ 5 (emphasis omitted)).  IMGA was not required "to provide working capital or other funding to [DC720JV] or contribute to any deficit or shortfall in operations."  (*Id.* ¶ 10).  IMGA was "deemed to be an independent contractor" (*id.* ¶ 9), and "[a]ll decisions regarding the operation of the Sports Complex [were] in [DC720JV]'s sole discretion," (*id.* ¶ 6).  The consulting agreement granted DC720JV a nonexclusive license to use IMGA's mark in connection with the Sports Complex (*see id.* ¶ 7), and IMGA had to approve the use of its name and logo in marketing materials and other documents that related to Orlando Cay Clubs (*see* PSOF ¶ 4).  For these services, IMGA would be paid an annual fee of $250,000 and a royalty payment of 2 percent of the gross revenue from sales of units at Orlando Cay Clubs.  (*See* DSOF ¶ 11).

3

At the same time IMGA also entered into a license-and-cooperation agreement with Cay Clubs, which granted IMGA and Cay Clubs the nonexclusive right to use each other's marks in the marketing and promotion of certain real-estate projects, including Orlando Cay Clubs. (*See id.* ¶ 8). IMGA designated Cay Clubs its "Exclusive Real Estate Developer." (PSOF ¶ 3). The parties agreed to meet at least twice a year to discuss how to market their relationship and the developments, and the parties agreed to implement media plans and joint promotions. (*See id.*). IMGA was to receive a guaranteed license fee of $2,000,000 in accordance with the license-and-cooperation agreement. (*See id.* ¶ 11). The consulting agreement was made an addendum to the license-and-cooperation agreement. (*See id.* ¶ 3).

Despite these agreements, neither DC720JV nor Cay Clubs ever made payments to IMGA, which ultimately received no money in connection with the Project. (*See* DSOF ¶ 12).

## B.     The Marketing and Sale of Orlando Cay Clubs

Cay Clubs marketed Orlando Cay Clubs units through its own sales force and a network of independent real-estate brokers and investment groups throughout the country (*see id.* ¶ 19), although IMGA participated in the marketing of the Project as well in 2006 and 2007 (*see* PSOF ¶ 19). IMGA's marketing director reviewed all Cay Clubs marketing materials that used the IMGA logo and name (*see* Young Dep. 46:15–19, Aug. 26, 2009), and Greg Breunich, IMGA's managing director and senior vice president of IMGA's parent company, approved all representations about IMGA in marketing materials (*see* PSOF ¶ 19).[3]  When Cay Clubs first developed its marketing

---

[3]  Breunich made a personal investment in the development of Orlando Cay Clubs and had an ownership interest in DC720, LLC from which he stood to personally profit from the sales. (*See* Breunich Dep. 221:12–21, July 28, 2009).  He understood that DC720JV was affiliated with Cay Clubs.  (*See id.*

materials for Orlando Cay Clubs, it directed its advertising agency to consult with IMGA on the appropriate language to use.  (*See id.*).  IMGA used its real-estate brokerage company to assist in the sale of units by including language on the Cay Clubs section of its website with the aim of leading customers to contact its brokerage company before others.  (*See id.*).  And IMGA employees participated in sales presentations and conducted tours of the Bradenton facility to prospective buyers (at least one of whom is a Plaintiff).  (*See id.*).

To buy the units, each Plaintiff signed a purchase-and-sale agreement with DC720JV.  (*See* DSOF ¶ 20).  IMGA was not a signatory to any of these agreements nor was it mentioned anywhere in the relevant closing documents (*see id.* ¶¶ 21, 27), and each agreement contained an integration clause stating it contained the entire agreement of the parties (*see id.* ¶ 21).  IMGA asserts the Plaintiffs entered into these agreements having no familiarity with DC720JV, and all but two made no inquiry at all.[4]  (*See id.* ¶ 24).  Most of the Plaintiffs did not know what DC720JV was or whether it had any relationship with IMGA.  (*See id.*).  One Plaintiff said the title company told her DC720JV was the name of the supposed partnership among Cay Clubs, IMGA, and Sunvest, but she did not follow up on whether this was true.  (*See* Neil Dep. 170:17–172:20, 173:21–177:18, July 22, 2009).  Another said she looked up DC720JV on the Florida Secretary of State website, but she did not determine what DC720, LLC, which was listed as the "manager member," was or whether it had anything to do with IMGA.  (*See* Palmer Dep. 121:1–122:18, Aug. 27, 2009).

---

246:11–15).

[4]  According to public records available at the time, DC720JV was a Florida limited-liability company that was fully owned by DC720, LLC, another Florida limited-liability company, which in turn was owned and managed by the two principals of Cay Clubs, F. Dave Clark and David W. Schwarz.  (*See* DSOF ¶ 22).

Case No. 08-62076-CIV-ALTONAGA/McAliley

Yet according to the Plaintiffs, no one seemed to know exactly what DC720JV was. Harvey Birdman of Sunvest, which had entered into an option agreement with DC720JV for Orlando Cay Clubs, assumed DC720JV, as the seller, was set up to pass title on the sale of the units to buyers. (*See* Birdman Dep. 251:18–25 & Exs., June 8, 2009). Cay Clubs sales manager Delores Wooldridge thought DC720JV "was simply an entity established for the purpose of passing title to purchasers" and "had no employees or assets." (Wooldridge Aff. ¶ 3). Christian O'Ryan, the attorney who prepared the purchase-and-sale agreements, assumed DC720JV owned or had an interest in the property, but he too knew very little about it or its relationship to Cay Clubs. (*See* O'Ryan Dep. 145:1,181:5–10, 186:12–16, Aug. 25, 2009).

## C.    Allegations of Mortgage Fraud

According to IMGA, all of the Plaintiffs except for one[5] committed mortgage fraud to buy their units. One of the mortgage documents was a Second Home Rider, which required the borrower to use the unit as a second home only and forbade the borrower from placing the unit into rental-pool arrangements. (*See* DSOF ¶ 32). Yet each Plaintiff who signed the Second Home Rider knew he or she was buying the unit as an investment, not as a second home, and was going to place the unit into a rental-pool arrangement. (*See id.* ¶ 34). Indeed, the Plaintiffs elected to participate in an optional lease-back program by which they ceded possession and control of their units to a Cay Clubs affiliate for a payment of 15 percent of the unit-purchase price. (*See id.* ¶ 35). Further, several Plaintiffs endorsed exaggerations of their monthly income and assets on the mortgage applications. (*See id.* ¶ 38).

---

[5] Patricia French.

6

Case No. 08-62076-CIV-ALTONAGA/McAliley

These allegations, the Plaintiffs say, are "overblown." (Pls.' Opp'n [D.E. 207] 2). Most of the Plaintiffs were sent to preferred lenders and particular mortgage brokers who knew the units would be rented to prospective IMGA students. (*See* PSOF ¶¶ 31–37). Each Plaintiff spoke with his or her mortgage broker about the expected lease-back payment and the fact the property would be subject to rentals. (*See id.*). Further, the Plaintiffs applied for their loans over the phone, and say they accurately relayed their income and asset information to the loan brokers and supplied the brokers and lenders with documentation confirming their income and assets. (*See id.* ¶¶ 38–40). Relying on the mortgage broker to complete the loan application, none of the Plaintiffs personally filled out the application. (*See id.*). Many were accurate, and one broker in particular filled out the majority with inaccurate information. (*See id.*). The Plaintiffs say they did not see the completed loan application until the loan was approved; and, moreover, they were asked to sign the document at closing together with a large number of other documents. (*See id.*). Neither their lenders nor any prosecutorial agency has accused or charged the Plaintiffs with fraud. (*See id.*).

**D.      Representations and Promises About the Project**

IMGA asserts it never made promises about Orlando Cay Clubs to any Plaintiff. (*See* DSOF ¶ 41). In March 2007 IMGA created some materials that described its collaborative relationship with Cay Clubs and referred to its expected influence within sports-training offerings at future Cay Clubs locations, including Orlando. (*See id.* ¶ 43). Sometime between March and June 2007 a version of these materials was posted on the IMGA website, which stated, "now you can feel the IMGA influence within the sports and recreation offerings at other Cay Clubs sites, including: . . . Orlando Cay Club[s]'s upcoming field sport complex." (*Id.* ¶ 44). Except for three Plaintiffs, none claims

7

Case No. 08-62076-CIV-ALTONAGA/McAliley

to have had any contact with IMGA personnel before making the decision to buy a unit, and none claims that IMGA made promises or representations that IMGA would construct or finance the Orlando property. (*See id.* ¶ 46). To the only two Plaintiffs who toured the Bradenton campus, IMGA referred to the "unique sports programming" that IMGA hoped to implement at Cay Clubs.[6] (*See id.* ¶ 47).

The Plaintiffs assert that IMGA made two kinds of representations that were deceptive: first, that IMGA would build the facility and sports complex; second, that IMGA was in a partnership with Cay Clubs. As to the first, the Plaintiffs assert that the sales people, including Wooldridge, understood that the IMGA academy and sports-training program was the centerpiece of the project. (*E.g.*, Wooldridge Aff. ¶ 4). Marketing materials contained renderings showing the conversion of the property into an IMGA sports complex and contained statements such as "Orlando Cay Club Resort and Academy is definitely the prime location for IMG Academies Tournament and Field Sport Training Facility since it is strategically located and already proven as one of the most popular world class travel destinations." (PSOF ¶¶ 41–50). Architect renderings prominently depicted a facility and sports complex, with designated areas for classrooms, lecture halls, and a sports amphitheater, and these renderings were made part of the marketing materials provided to prospective buyers. (*See id.*). Webinar and PowerPoint sales presentations represented that the property would be turned into an IMG Academy, and that IMGA would be moving its soccer-training facilities to Orlando. (*See id.*). The Cay Clubs website represented that Cay Clubs had been

---

[6] According to one Plaintiff, IMGA executive Chris Ciaccio, who took her on a tour of the Bradenton campus, told her that IMGA and Cay Clubs were partners in Orlando Cay Clubs. (*See* Kleiber Dep. 71:7–10, 72:14–16, 75:21–22, May 27, 2009).

named IMGA's real-estate development partner in order to create new IMGA facilities.  (*See id.*).

Sample appraisals, which were given to prospective buyers, based the appraised value partly on the

following: "Plans call for IMG to locate its international soccer training program at the Orlando

Academy Cay Club."  (*Id.*).

Based on these materials or presentations or both, each Plaintiff believed that IMGA was

locating a sports-training facility at Orlando Cay Clubs.  (*See id.*).  It is the opinion of real-estate

expert Jack McCabe that, based on the marketing materials and sales presentations, as well as the

name recognition of IMGA, buyers had a reasonable expectation that the development would be

completed as marketed.  (*See id.*).  It is also his opinion that buyers would not have bought the units

if not for IMGA's planned academy.  (*See id.*).

The second kind of representation is that IMGA and Cay Clubs were in a partnership.  IMGA

created materials after March 2007 that used terms like "collaboration," "partner," "perfect match,"

and "team" to describe its relationship with Cay Clubs, but IMGA contends it never represented

itself to be in a *legal* partnership with Cay Clubs or Sunvest.  (*See* DSOF ¶ 48).  IMGA also notes

that no Plaintiff had any information about IMGA's financial condition or whether it made any

financial commitments to the Project.  (*See id.* ¶ 50).  The Plaintiffs assert that marketing materials,

approved by IMGA, represented that IMGA was Cay Clubs's development partner in the Project.

(*See* PSOF ¶¶ 41–50).  Cay Clubs sales people and employees were told and believed that IMGA had

partnered with Cay Clubs to develop Orlando Cay Clubs.  (*See id.*).  IMGA was represented at public

meetings to be a partner in the development of the Project.  (*See id.*).  In presentations to prospective

buyers it was represented that Orlando Cay Clubs was developed as a joint venture with IMGA to

meet the pent-up demand for soccer and other field-sports training that IMGA could not provide at Bradenton.  (*See id.*).  Similar representations that IMGA and Cay Clubs were in a partnership to develop Orlando Cay Clubs as a joint venture were made to buyers through direct statements, e-mails, webinars, press releases, and on the websites of IMGA, Cay Clubs, and various real-estate brokers.  (*See id.*).

IMGA was aware that sales associates were notified in March 2006 that IMGA and Cay Clubs were in the final stages of completing a new joint venture for the Project, and that Cay Clubs made public statements about a joint venture with IMGA.  (*See id.*).  Cay Clubs informed IMGA it would "come up with some partnership language and forward for approvals."  (*Id.*).  When describing IMGA's relationship with Cay Clubs in the Project, IMGA approved of Cay Clubs using the words partners and partnership.  (*See* Young Dep. 74:6, 75:13–17, 91:9–12).  IMGA also educated Cay Clubs about how best to use the IMGA name in marketing materials and make the most of its association with IMGA, *i.e.*, that IMGA is the most famous sports-training facility in the world.  (*See id.* 196:4–197:6).  IMGA created the "verbiage" to describe the relationship as a partnership.  (*See* PSOF ¶¶ 41–50).

IMGA made public statements about the partnership.  In 2006 IMGA created a "Cay Clubs" partner web page on its website stating that Cay Clubs is IMGA's "in-house real estate development partner."  (*Id*).  The website was continuously updated in 2006 and 2007; by July 2006 IMGA's Cay Clubs web page read:

**Cay Clubs and IMG Academies**

These two industry leaders have joined forces to create an exciting partnership unique to the resort vacation/real estate sales industry.  In short, Cay

Case No. 08-62076-CIV-ALTONAGA/McAliley

Clubs has become IMG Academies' in-house real estate development partner. In this capacity, Cay Clubs will enable IMGA to expand its "community" in terms of programming, accommodations and affiliated sites. In return, IMGA becomes Cay Clubs['s] internal expert relative to sports training, education, health and fitness programs, amenities and facilities.

Set forth below are four prime examples of the Cay Club/ IMGA collaboration:
. . . .

   4.  IMGA's impact on Cay Club[s]'s customers/investors in Bradenton and Sarasota is easy to understand. But, now you can feel the IMGA influence within the sports and recreation offerings of other Cay Club[s] sites including:
. . . .

   b.  The Orlando Cay Club[s]'s upcoming field sport complex, which will eventually feature camps, tournaments and special events in sports such as soccer, football, field hockey, lacrosse, etc.

(*Id.*).

In late 2006 IMGA decided to integrate the Cay Clubs real-estate partnership relationship into

its own marketing plans. (*See* Young Dep. 199:3–15). The marketing plan, created in 2007, focused

on the IMGA–Cay Clubs real-estate partnership with public statements, advertisements, web pages,

and press releases that contained the following statements:

•   "Cay Clubs is proud of its relationship with IMG Academies as its exclusive residential development and hospitality partner and is pleased to offer you the opportunity to join this exciting partnership with the purchase of a Cay Clubs/IMG Academies resort property."

•   "Two unique leaders in their respective fields, Cay Clubs and IMG Academies have joined forces to create a partnership that is destined to change the entire resort vacation/real estate sales industry."

•   "***A team effort***[:]  This new collaboration between Cay Clubs and IMG Academies gives each entity access to the other's unique resources. As IMG Academies' real estate development partner, Cay Clubs will enable IMG Academies to reach, and accommodate, a much larger audience by creating new homes for IMGA facilities, as well as increasing and enhancing its accommodation options and capacities."

11

Case No. 08-62076-CIV-ALTONAGA/McAliley

- "Conversely, the impact that IMG Academies has on Cay Clubs['s] network of resort destinations will be just as profound . . . .  With this addition, IMG Academies takes the Cay Clubs resorts to a level never seen in the resort destination world, and the timing couldn't be better.  Capitalizing on consumer demand of healthy life styles, the partnership between Cay Clubs and IMG Academies offers the balance between active lifestyles and relaxing resort living.  By combining their unique talents and resources, Cay Clubs and IMG Academies offer a unique array of opportunities for their joint members, investors and resort visitors."

- "Cay Clubs and IMG Academies — *a perfect match* — in Bradenton, FL, Orlando, FL, Crested Butte, CO, with more destinations to follow!"

(PSOF ¶¶ 41–50).

The Plaintiffs allege their belief that IMGA was a partner in the development of Orlando Cay Clubs was critical to their decision to buy their units.  (*See id*).  IMGA's national reputation and financial strength gave the Project immense credibility.  (*See id.*).  Had they been told that IMGA was only a consultant, the Plaintiffs insist none would have bought a unit.  (*See id.*).

E.     **IMGA's Intentions**

IMGA's personnel believed that Cay Clubs would develop Orlando Cay Clubs (*see* DSOF ¶ 51); IMGA intended to fulfill its obligations under the consulting agreement at all relevant times (*see id.* ¶ 52); and IMGA always acted in good faith with regard to its obligations (*see id.* ¶ 53).  For example, IMGA provided Cay Clubs with advice and guidance when requested on requirements and layouts for sports fields, estimates on facility size, costs, and anticipated student attendance.  (*See id.* ¶ 54).  IMGA pursued world-renowned professional sports teams and instructors to anchor the sports-training programs it hoped would be provided at Orlando Cay Clubs.  (*See id.* ¶ 55).  At Cay Clubs's request, IMGA accompanied Cay Clubs representatives to meetings with local officials and provided information for planning commission hearings to address the likely impact that a sports academy would have on the neighboring community.  (*See id.* ¶ 56).  While it is altogether unclear

12

Case No. 08-62076-CIV-ALTONAGA/McAliley

how a real estate expert can opine on such a matter, according to what he had read and reviewed, the Plaintiffs' real-estate expert, Jack McCabe, said that IMGA did intend to fulfill its role. (*See id.* ¶ 59).

The Plaintiffs, on the other hand, assert that IMGA knew the representation that IMGA and Cay Clubs were partners was deceptive because, in fact, they were not legally partners or joint venturers. (*See* PSOF ¶¶ 51–56). None of the public statements about the relationship informed prospective buyers that IMGA and Cay Clubs were not in a true partnership. (*See id.*). As a possible reason, the Plaintiffs note that IMGA had a financial incentive to allow partnership representations because it expected to receive significant revenue based on the sales of the units. (*See id.*; McNeal Dep. 107:19–111:25, Aug. 4, 2009).

The Plaintiffs also assert that IMGA knew the representation that Orlando Cay Clubs would feature an IMGA sports-training facility was false and misleading. The Plaintiffs note that IMGA had been aware since 2006 that the location of the Project was not a good choice for an IMGA facility, and IMGA had been advised that it should not go forward with plans to develop the property. (*See* PSOF ¶¶ 51–56). The Plaintiffs also note that entitlements were not obtained, construction plans or blueprints were not prepared, zoning was not approved, and cost estimates were never made. (*See id.*).

\* \* \*

According to their three-count Second Amended Complaint, the Plaintiffs allege that the Defendants and their purported partner, Cay Clubs, used deceptive-and-unfair trade practices in violation of the FDUTPA. Count one seeks a declaration that the Defendants' actions violated the

13

FDUTPA.  (*See* Second Am. Compl. 59–60).  Count two is for damages due to the Defendants' and Cay Clubs's representations that they would develop the apartment complex and surrounding property into Orlando Cay Clubs.  (*See id.* 60–62).  And Count three is for damages due to the Defendants' and Cay Clubs's representations that they were in a partnership, which caused the Plaintiffs to buy their units.  (*See id.* 62–63).  The Plaintiffs seek as damages "the amount of the difference between the value of the units in the condition they were delivered and the value of the units in the condition they should have been delivered according to the representations in the marketing materials and sales materials."  (*Id.* ¶¶ 259, 268).

After extensive discovery, IMGA now moves for summary judgment.  IMGA contends the Plaintiffs' claims are barred by their own misconduct; IMGA cannot be held liable directly under the FDUTPA for any representations that it would build a sports academy or was in a partnership with Cay Clubs; and IMGA cannot be held vicariously liable for the acts of Cay Clubs under Florida's purported-partnership statute.

## II.  LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Hayes v. City of Miami*, 53 F.3d 918, 921 (11th Cir. 1995)).

Case No. 08-62076-CIV-ALTONAGA/McAliley

## III.  ANALYSIS

### A.      The Plaintiffs' Misconduct

According to IMGA, the Plaintiffs' claims are barred by the doctrines of unclean hands and

*in pari delicto*.

> Every Plaintiff except for one signed false assurances that they would only use their
> Orlando Cay Clubs units as "second homes" on their loan applications, knowing full
> well that, to the contrary, they were purchasing the properties as investments and
> intended to — and in fact did — place them into rental pool arrangements by electing
> to participate in the Orlando project's optional "lease-back" program.  In addition,
> many Plaintiffs inflated their income on mortgage applications.

(Def.'s Mem. [D.E. 172] 9 (citation omitted)).

The Plaintiffs give three reasons why these doctrines do not apply.  First, they assert that their

alleged misconduct, *i.e.*, mortgage fraud, does not directly relate to the matter in litigation, *i.e.*,

IMGA's deceptive-and-unfair trade practices.  (*See* Pls.' Opp'n 4).  Second, unclean hands applies

only if the party raising the defense was the target of, and was personally injured by, the misconduct;

any lying on the part of the Plaintiffs, they assert, targeted or harmed their lenders, not IMGA.  (*See

id.*).  Regarding *in pari delicto*, that doctrine requires both the plaintiff and defendant to be *in delicto*,

*i.e.*, "'concurring in an illegal act,'" *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039,

1044 (Fla. 2d DCA 2007) (Canady, J.) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472

U.S. 299, 306 (1985)), which, the Plaintiffs contend, is not the case here (*see* Pls.' Opp'n 6–7).

Third, neither unclean hands nor *in pari delicto* applies as a matter of public policy to their FDUTPA

claims.  (*See id.* 7–8).

15

Case No. 08-62076-CIV-ALTONAGA/McAliley

1.     *Unclean Hands*[7]

Under the doctrine of unclean hands, "'One who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law.'" *In re Garfinkle*, 672 F.2d 1340, 1346 n.7 (11th Cir. 1982) (quoting *Peninsula Land Co. v. Howard*, 6 So. 2d 384, 389 (Fla. 1941) (alteration omitted)).  The conduct constituting the unclean hands "must generally be connected with the matter in litigation and must affect the adverse party." *McCollem v. Chidnese*, 832 So. 2d 194, 196 (Fla. 4th DCA 2002) (citing *Pennington v. Pennington*, 390 So. 2d 809, 810 (Fla. 5th DCA 1980)).  To be sure, "that a party's conduct is disreputable is entirely irrelevant where the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be." *Id.* (citing *McIntosh v. Hough*, 601 So. 2d 1170, 1172–73 (Fla. 1992)).  Accordingly, "[a] party must prove that he was injured in order for the unclean hands doctrine to apply." *Id.* (citing *Sandusky v. First Nat'l Bank of Sikeston*, 773 S.W.2d 95 (Ark. 1989)).

Relying on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn*, 191 F. Supp. 2d 1346 (M.D.

---

[7]  The Court proceeds with the understanding, as advanced by IMGA, that the doctrine of unclean hands may be used to bar FDUTPA claims for money damages, even though unclean hands is historically an equitable defense.  *See May v. Nygard Holdings, Ltd.*, No. 6:03-cv-1832-Orl-DAB, 2007 WL 2120269, at *3–4 (M.D. Fla. July 20, 2007).  Relying on cases dealing with the doctrine of *in pari delicto*, *see id.* (citing *Kulla v. E.F. Hutton & Co.*, 426 So. 2d 1055, 1057 (Fla. 3d DCA 1983); *O'Halloran*, 969 So. 2d at 1044), the *May* court rejected an argument that the doctrine of unclean hands applies only to suits in equity, *id.*  *May* notwithstanding, the Plaintiffs contend neither doctrine applies to the FDUTPA because of public policy; although no Florida state court appears to have specifically addressed the question, the Plaintiffs' position has support.  *See* Nat'l Consumer Law Ctr., Unfair and Deceptive Acts and Practices § 4.2.20.3, at 248 (7th ed. 2008) ("That the consumer has unclean hands is not a defense to a UDAP action.").  The Court need not pass on the applicability of these doctrines to the FDUTPA because even assuming they do apply, neither bars the Plaintiffs' claims here.

Fla. 2002), *Mims v. Old Line Life Insurance Co. of America*, 46 F. Supp. 2d 1251 (M.D. Fla. 1999), *Marin v. Seven of Five Ltd.*, 921 So. 2d 699 (Fla. 4th DCA 2006), and *Pennington v. Pennington*, the Plaintiffs first assert their conduct does not directly relate to the matter in the litigation.  On an initial read of these cases, each with different facts and subject matters, no clear definition emerges of when unclean-hands conduct directly relates to the matter in litigation and when it does not.  But on close examination there are some shared characteristics.  One is that courts require the connection between the unclean-hands conduct and the matter in litigation to be very close.  It is not enough that the unclean-hands conduct is the same kind of conduct as the matter in litigation (*e.g.*, encouraging the poaching of competitors' professionals to obtain clients, as in *Dunn*), involves the same overall transaction (*e.g.*, the insurance-application process, as in *Mims*), or constitutes the failure technically to comply with the same judgment one seeks to enforce (*e.g.*, *Pennington*).  As correctly stated by the Plaintiffs' counsel, by directly related, "we're talking *really* directly related."  (Summ. J. Hr'g Tr. 25:12–13, Jan. 7, 2010).

Which leads to a second characteristic: the "matter in litigation" to which the unclean-hands conduct relates must be the basis of the plaintiff's claim.  *E.g.*, *Dunn*, 191 F. Supp. 2d at 1348–49, 1355 (wrongfully using one's employer's confidential information); *Mims*, 46 F. Supp. 2d at 1254, 1260 (counterclaim) (making misrepresentations on an insurance application); *Marin*, 921 So. 2d at 700 (failing to pay one's mortgage); *Pennington*, 390 So. 2d at 810 (refusing to comply with a judgment).  It is, in essence, the reason for the lawsuit; the unclean-hands conduct must be closely connected to that.  In *Marin*, the one case cited where (some of) the unclean-hands conduct directly related to the matter in litigation, both of these characteristics were satisfied.  There was a very close

17

connection between the unclean-hands conduct, *i.e.*, a wrongful foreclosure due to the failure to honor a new financing arrangement, and the matter in litigation, *i.e.*, the defendants' failure to pay their mortgage in accordance with the prior terms. 921 So. 2d at 700–01.

According to IMGA, the Plaintiffs have unclean hands because they promised their lenders they would use their units as second homes and not subject them to rental-pool arrangements, yet none intended to occupy the unit, and all entered into an optional lease-back program. (*See* DSOF ¶¶ 32–37; Hr'g Tr. 7:25–10:6). It is undisputed that the Plaintiffs, apart from French, had intentions inconsistent with those stated in the mortgage documents they signed.[8] But the bases for the Plaintiffs' claims, and thus the matters in litigation, are the allegedly deceptive-and-unfair "representations and omissions about IMGA's and Sunvest's purported partnership and participation in the project, and promises to convert the units and develop the Eaglewood Apartment property into the Orlando Cay Clubs Resort and Academy." (Second Am. Compl. ¶ 236). "Another deceptive practice used to sell Plaintiffs unconverted units was a promised 15% rebate of the purchase price to be paid forty-five days after purchase of a unit." (*Id.* ¶ 237). The promised rebate was allegedly either not paid or underpaid. (*See id.* ¶ 238). The Defendants allegedly knew that the Project would not likely be built, yet used deceptive-and-unfair high-pressure tactics to close on as many units as

---

[8] At oral argument the undersigned asked what would become of these doctrines at trial if they failed on summary judgment. In answering, the Plaintiffs' counsel said even though the Plaintiffs' intentions differed from what the mortgage documents they signed stated, that does not mean they committed fraud. "That's being dumb for not reading the contract," he said, referring to what "everybody" has done at some point and what the Plaintiffs assert they did here. (Hr'g Tr. 24:7–8). "That has certain legal consequences, but one of them is not being guilty of intentional fraud and one of them is not unclean hands." (*Id.* 24:8–10). The Court emphasizes this exchange because, aware this is a publicly available court order, the Court expresses no opinion on whether the Plaintiffs' actions amount to mortgage fraud. The Court assumes the Plaintiffs' actions amount to mortgage fraud for the purpose of deciding this Motion.

possible. (*See id.* ¶ 240). And the Defendants allegedly used deceptive-and-unfair disclaimers on the purchase-and-sale agreements to shield themselves from liability. (*See id.* ¶ 241). These are the matters in litigation, and, under the principles outlined above, the bulk of the Plaintiffs' allegedly unclean-hands conduct is unrelated to them. That the Plaintiffs may be guilty of wrongdoing in separate transactions with their lenders is simply not connected to the Defendants' allegedly deceptive actions.

The Plaintiffs' signing of Second Home Riders in connection with the purchases of their units, however, requires a closer look. By signing the Second Home Riders, the Plaintiffs agreed not to place their units into rental-pool arrangements, yet by entering into the lease-back program, the Plaintiffs did exactly that. "So," IMGA's counsel said, "if a typical plaintiff here spent $400,000 on their unit, they received, after signing the leaseback, $60,000 cash back. . . . This was an integral part of the deal and they got real serious consideration for signing it." (Hr'g Tr. 9:15–20). This is certainly true. But ultimately the signing of the Second Home Riders was a different transaction with a different party for a different purpose. Second Home Riders ensure that the borrower does not use the home as an investment property, which makes the loan riskier to the lender. *See Beaulialice v. Fed. Home Loan Mortgage Corp.*, No. 8:04-cv-2316-T-24-EAJ, 2007 WL 744646, at *8 (M.D. Fla. Mar. 6, 2007) ("'[N]on-owner occupied' or 'investor' mortgages are far riskier than owner-occupied mortgages . . . ."). By entering into the lease-back program, the Plaintiffs, to be sure, injured their lenders. But the matter in litigation is the Defendants' allegedly deceptive lease-back program. That the Plaintiffs lied to their lenders about renting their units has little to do with whether the lease-back program was deceptive.

Case No. 08-62076-CIV-ALTONAGA/McAliley

Which leads to the Plaintiffs' second reason for why the unclean-hands doctrine does not apply, *i.e.*, that their conduct did not target or otherwise injure IMGA. The Court concludes it did not because IMGA was not the target of the Plaintiffs' conduct; the lenders were. *See Chidnese*, 832 So. 2d at 196; *see also Beaulialice*, 2007 WL 744646 at *8 ("Defendant suffered injury the moment it received an investment property loan instead of the more valuable owner-occupied loan that it had bargained for."). IMGA correctly replies that in *McIntosh* the Florida Supreme Court permitted the defendants' assertion of an unclean-hands defense even though they were not the targets of the plaintiff's fraud. (*See* Def.'s Reply 3; *see also* Hr'g Tr. 20:11–12 ("I'm not sure the standard is we need to be the target . . . .")). But a close examination of *McIntosh* shows that the decision does not compel a waiver of the general target requirement here. In *McIntosh* the plaintiff divorced his wife and then conveyed his property to her in order to avoid paying a judgment — a fraudulent transfer. Contrary to the plaintiff's expectations, the wife conveyed the property to her corporation, which then conveyed the property (for consideration) to Miles, who in turn conveyed a one-half interest in it to McIntosh. McIntosh later bought the rest of the property, and the plaintiff then sued to quiet title. 601 So. 2d at 1171. The Florida Supreme Court accepted jurisdiction to resolve the question of whether the unclean-hands doctrine applied.

The plaintiff's fraud, the court found, "affirmatively damaged" the parties to the suit, even though they were not the original targets of it.

> These parties took affirmative action by purchasing the property with faith in the title of the fraudulent grantee. The fraud was perpetrated to put the deed in [the wife]'s name; it was this fraud which ultimately convinced the defendants to purchase the property from [the wife]. In short, it was [the plaintiff]'s fraud which put in motion the events which culminated in Miles' acquisition of the property. Under the unique facts of this case, where the fraudulent grantor seeks to quiet title against innocent

purchasers who affirmatively relied on the results of the fraud, the innocent purchasers may raise an unclean hands defense.

*Id.* at 1173. So in *McIntosh* there were good reasons not to apply the "target" requirement. The innocent purchasers affirmatively relied on the results of the fraud, and they would not have acquired the property but for it.

Here, not only was IMGA not the target of the Plaintiff's conduct, but there is no evidence, unlike in *McIntosh*, that the Plaintiffs' conduct in any way damaged or otherwise affected IMGA. IMGA has presented no evidence that it acted affirmatively because of the Plaintiffs' conduct, *see id.*, relied on the results of the conduct, *see id.*, or otherwise altered its behavior because of it, *see Chidnese*, 832 So. 2d at 197. The undersigned pressed IMGA on this point at oral argument, and the response was that IMGA "relied on the fact that [the Plaintiffs] were going to treat this as a second home." (Hr'g Tr. 22:6–7). There is, however, no evidence of this; and at any rate, the nature and extent of any such reliance differs greatly from the parties' in *McIntosh*, innocent purchasers who would not and could not have bought the property but for the plaintiff's fraud. 601 So. 2d at 1173. Although counsel for IMGA offered to provide support for reliance at a later time (*see* Hr'g Tr. 22:7–10), the Court would hesitate to take an *Erie*[9] guess and conclude that *McIntosh* — a case with a set of "unique facts," *id.*, and, to the Court's knowledge, the only Florida case in which the "target" requirement of the unclean-hands doctrine has been excused — applies here.

2.     *In Pari Delicto*

IMGA also raises the defense of *in pari delicto*, which is a "corollary of the doctrine of

---

[9]  *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

Case No. 08-62076-CIV-ALTONAGA/McAliley

unclean hands." *O'Halloran*, 969 So. 2d at 1044 n.3.

> *In pari delicto* means "in equal fault." The phrase appears in the legal maxim: "Where both parties are equally in the wrong, the position of the defendant is the stronger." In pari delicto refers to the plaintiff's participation in the same wrongdoing as the defendant. The defense of *in pari delicto* is both an affirmative defense and an equitable defense. Broadly speaking, the defense prohibits plaintiffs from recovering damages resulting from their own wrongdoing.

*Id.* at 1044 (citations, footnote call number, and some internal quotation marks omitted). The

defense of *in pari delicto* rests on two premises:

> [F]irst, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. In its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.

*Id.* (quoting *Berner*, 472 U.S. at 306–07 (citations and internal quotation marks omitted)).

As explained above, the Plaintiffs' wrongdoing concerns signing mortgage documents with

information that was inconsistent with their intentions; IMGA's wrongdoing concerns alleged

deceptive-and-unfair trade practices with regard to Orlando Cay Clubs. Since "[i]n pari delicto refers

to the plaintiff's *participation in the same wrongdoing* as the defendant," *id.* (emphasis added)

(internal quotation marks omitted), the doctrine would seem inapplicable here. As the Plaintiffs

state, they "did not participate in the deceptive acts and practices IMGA and Cay Clubs used to sell

units in the Orlando Academy, and IMGA didn't help Plaintiffs fill out their mortgage applications."

(Pls.' Opp'n 7).

An example helps define the contours of the doctrine. In *Turner v. Anderson*, which both

parties rely on, the appellant, smarting from having lost in an arbitration proceeding, sued his former

22

attorneys for breach of fiduciary duty because they advised him to testify untruthfully, which he did, to his detriment.  704 So. 2d 748, 749 (Fla. 4th DCA 1998).  Whether a client who acted illegally on his attorney's advice could later sue the attorney for damages resulting from the act was a question of first impression in Florida.  *See id.* at 750.  The court answered the question negatively: "no public policy should allow appellant to recover damages as a result of engaging in criminal conduct."  *Id.* at 751.

*Turner* also concerned a separate issue, minor to the case but helpful here.  During the arbitration, the attorneys also represented the client's former employer.  The client alleged that the attorneys breached their fiduciary duty to him by representing "him and his employer . . . in such a way as to shift liability from the employer to appellant personally."  *Id.* at 749.  Because of the doctrine of *in pari delicto*, the trial court granted the attorneys' motion for summary judgment on this alleged breach as well, *see id.*, and the appellate court affirmed to the extent the defense of *in pari delicto* barred the client from recovering damages because of his perjury, *see id.* at 752.  But the defense would not "bar him from recovering on his separate claims that his former counsel caused him damage by improperly engaging in other litigation tactics in order to shift liability from his employer to him."  *Id.*  The appellate court reversed the trial court on that point.

*Turner* illustrates side by side when the doctrine of *in pari delicto* bars a claim and when it does not.  Apropos of the perjury, the attorneys told the client to testify falsely, and the client — a man of a "sophisticated background" "with full recognition of the illegality of what he was doing," *id.* at 751 — acted on that advice.  According to the court, no public policy should allow the client to recover as a result of his perjury.  *Id.*  And the client and his attorney may fairly be said to have

Case No. 08-62076-CIV-ALTONAGA/McAliley

engaged in the same wrongdoing.

The separate breach-of-fiduciary-duty claim, on the other hand, was quite different.  The client's attorneys shifted liability from his former employer to him to his detriment, and the appellate court concluded the attorneys could still be liable therefor, irrespective of the client's perjury.  Thus, the client's wrongdoing, *i.e.*, perjury, and the attorneys' wrongdoing, *i.e.*, favoring one client over another, were not the same; the parties were not *in delicto*.  It followed that the client's separate breach-of-fiduciary-duty claim should proceed, unaffected by the doctrine of *in pari delicto*.  *See id.* at 752.

Here too, the doctrine of *in pari delicto* should not bar the Plaintiffs' claims against IMGA for deceptive-and-unfair trade practices.  It is true, as IMGA argues, that a measure of the Plaintiffs' alleged damages is the value of their mortgages.  It may also be true, as IMGA asserts, that "the question is not [whether] the two parties are guilty of the same violation," but whether "they both commit[ted] a violation in the course of a[n] . . . integrated transaction."  (Hr'g Tr. 14:16–19).  But the Court is unpersuaded that the parties committed violations in the course of an integrated transaction.  The Plaintiffs allegedly lied to their lenders to obtain favorable loans; IMGA allegedly deceptively marketed and sold Orlando Cay Clubs.  This is not an integrated transaction on the order of *Turner*, where attorneys told the client to commit perjury, the client committed perjury, and then the client turned around and sued the attorneys for telling him to commit perjury.  Again, the Plaintiffs' transactions with their lenders were separate transactions with separate parties.

* * *

Because neither the doctrine of unclean hands nor *in pari delicto* bars the Plaintiffs' claims,

24

the Court proceeds to address IMGA's additional arguments.

**B.   FDUTPA**

On two separate theories of liability, the Plaintiffs seek to hold IMGA liable under the FDUTPA, which forbids "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conduct of any trade or commerce." FLA. STAT. § 501.204(1). They allege, first, that IMGA gave the misleading representation that it would build an IMGA sports academy at Orlando Cay Clubs,[10] and also that it was in a partnership with Cay Clubs and the other Defendants.   According to the Plaintiffs, these representations were deceptive, *i.e.*,"'likely to mislead' consumers," *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000), which caused them damages, *see Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) ("[A] consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.").   Second, the Plaintiffs seek to hold IMGA vicariously liable for the deceptive acts of Cay Clubs under Florida's purported-partnership statute. IMGA contends it may not be held directly liable for either representation or vicariously liable for the actions of Cay Clubs.

A brief explanation on the organization of the rest of the Order is appropriate.   IMGA breaks

---

[10]   To be clear, it is the Court's understanding that the Plaintiffs allege not only that IMGA represented that an IMGA sports academy would be built at Orlando Cay Clubs, but also that IMGA would build it.  Some statements in the Plaintiffs' opposition suggest both, while others suggest only that IMGA contributed to the impression that one *would be built*, without naming who would build it.  (*Compare* Pls.' Opp'n 3 ("IMGA . . . represented that it would build and locate an IMGA field sports facility at the Orlando Academy."), *with id.* 10 ("IMGA helped prepare . . . all to give the misleading impression that an IMGA facility would be located at [Orlando Cay Clubs]."))  Any ambiguity was clarified at oral argument.  (*See* Hr'g Tr. 46:20–23 ("an IMGA sports academy facility was going to be built and . . . IMGA was going to build it"); *id.* 65:25–66:1 ("IMGA was the one who was building this academy").

down the section of its memorandum dealing with the FDUTPA into two parts: one about direct liability and the other about vicarious liability. In the first, IMGA focuses almost exclusively on the alleged representations that it would build a sports academy. (*See* Def.'s Mem. 12–14. *But see id.* 14 n.4 (partnership representations)). In the second, IMGA focuses on the alleged representations that it was in a partnership with Cay Clubs. (*See id.* 14–15, 16–20). In their opposition, the Plaintiffs expand on the partnership representations in the section addressing direct liability. (*See* Pls.' Opp'n 9–10). IMGA did the same in its reply. (*See* Def.'s Reply [D.E. 210] 6). At oral argument, counsel for both parties addressed the partnership representations in the context of both direct and vicarious liability, and made clear the partnership representations pertain to both theories. (*See* Hr'g Tr. 33:7–6, 40:18–44:14, 45:25–46:17, 56:5–60:23, 61:2–66:5, 81:11–93:22). Conforming with the organizational structure of the briefing and of oral argument, the Court will address direct liability first, focusing both on the representations that IMGA would build a sports academy and on those that it was in a partnership. The Court will then address vicarious liability; that part concerns only the partnership representations.

    1.    *Direct Liability*

        a.    Sports Academy

IMGA contends it did not promise the Plaintiffs it would build, finance, or develop Orlando Cay Clubs, and any limited representations it made to the Plaintiffs were consistent with its "collaborative relationship with Cay Clubs and plans to help provide sports training programming." (Def.'s Mem. 12). Morever, even if there is evidence that IMGA promised it would develop Orlando Cay Clubs, the Plaintiffs' FDUTPA allegations would fail because "FDUTPA claims premised on

Case No. 08-62076-CIV-ALTONAGA/McAliley

allegedly deceptive statements made to consumers cannot stand, as a matter of law, where there is no evidence that the defendants knew the allegedly deceptive statements were false at the time when the statements were made." (*Id.* 13 (citing *Univ. of Miami v. Intuitive Surgical, Inc.*, 166 F. App'x 450 (11th Cir. 2006)).

The Plaintiffs assert IMGA was aware "this was just a concept and aspirational at best," but its actions "g[a]ve the misleading impression that an IMGA facility would be located at the Orlando Cay Clubs Resort and Academy." (Pls.' Opp'n 10). Those actions included meeting with an architect to develop architect renderings featuring a sports academy that would be used in the marketing of Orlando Cay Clubs; a 2006 letter from IMGA's director to appraisers stating IMGA "will or intends" to "[b]uild a field sports academy at Orlando Academy Cay Club"; providing marketing materials — promotional DVDs, brochures, etc. — about IMGA to Cay Clubs and sales people because "IMG Academies brings credibility to its projects" (Young Dep. 139:11–12); telling Cay Clubs to refer prospective buyers to its website; and, on September 13, 2007, approving a sales script representing that IMGA was "planning a field sport camp/academy event site in Orlando." (PSOF 12). Based chiefly on what they had read in written marketing materials and on the Internet, the Plaintiffs believed IMGA was going to locate an IMGA soccer facility at Orlando Cay Clubs. (*See, e.g.*, Chan's Decl. ¶¶ 7–8).

At oral argument, the Plaintiffs' counsel focused on the contrast between IMGA's contractual obligations, which were limited to giving advice and consulting (*see* Hr'g Tr. 48:21–49:2), and the "message IMGA helped craft and knew was being sent," *i.e.*, that IMGA would build an IMGA sports academy (Pls.' Opp'n 10). According to the Plaintiffs, the deception was that, despite helping

27

Case No. 08-62076-CIV-ALTONAGA/McAliley

to create or allowing the representation that IMGA would build an IMGA sports academy at Orlando Cay Clubs, IMGA never intended to develop an academy, nor did it have an obligation to do so. Further, the Plaintiffs say IMGA knew that the success of the Project was uncertain because plans, permits, and zoning changes had not been obtained.  Put simply, the Plaintiffs assert that while IMGA's contractual obligations were limited essentially to consulting, "[t]hat's not what was being told."  (Hr'g Tr. 49:2).

The Court begins by agreeing with IMGA that the Plaintiffs have failed to set out *specific facts* showing a genuine issue for trial on two properly supported statements.  *See* FED. R. CIV. P. 56(e)(2); *Allen v. Bd. of Public Educ. for Bibb County*, 495 F.3d 1306, 1314 (11th Cir. 2007); *see also* S.D. FLA. L.R. 7.5 C.2.  The first is that "[n]one of IMGA's materials . . . made any promises or representations to build, finance, or develop the Orlando property in any way."  (DSOF ¶ 45).[11] The Court qualifies this conclusion, however, by stressing that this is undisputed in the *literal* sense; apart from the letter (*see supra* note 11), the Plaintiffs have produced no IMGA materials stating it would literally build, finance, or develop an academy at Orlando Cay Clubs.  The second goes to IMGA's intent to fulfill its role in the Project or its belief that Orlando Cay Clubs would be successful.  (*See id.* ¶¶ 51–59).  The evidence shows that IMGA performed consistently with its consulting agreement by providing advice and guidance on requirements and layouts for sports

---

[11]  The Court understands "materials" to be marketing materials published to the Plaintiffs or others by written statements, websites, and so forth.  The Plaintiffs have produced a letter Breunich wrote to appraisers saying IMGA "will or intends to" build an IMGA sports academy at Orlando Cay Clubs.  But the Plaintiffs have not provided any specific references showing this letter was published.  *See* S.D. FLA. L.R. 7.5 C.2 ("The statement of material facts submitted either in support of or in opposition to a motion for summary judgment shall . . . [b]e supported by *specific references* . . . ." (emphasis added)).

28

fields; giving estimates on facility size, costs, and anticipated student attendance; pursuing sports teams and negotiating contracts with trainers and coaches who would eventually locate at Orlando Cay Clubs; and accompanying Cay Clubs' representatives at meetings.  (*See id.* ¶¶ 54–56).  While the Plaintiffs state "there is plenty of evidence of IMGA's lack of good faith" (Pls.' Opp'n 11), they say this in a general way, at the end of their opposition, without citation to the record.  In their statement of facts they note that Derek Taylor from Cay Clubs told Breunich that the location of the Project was not desirable (*see* Taylor Dep. 41:11–20, May 28, 2009), but this statement (and the Court infers that it was indeed made) does not reasonably support the inference that IMGA did not believe the Project would be a success.  The Plaintiffs also note that plans, permits, or zoning changes were not yet obtained for the academy.  (*See id.* 58:2–3, 68:12–16, 71:8–23, 139:3–141:23).  But, putting aside the fact that the Plaintiffs acknowledged zoning approvals had yet to be obtained and the Project was "preconstruction," this evidence does not reasonably support the inference that IMGA did not believe the Project would be a success, or that IMGA never intended to fulfill its obligations.  The Plaintiffs seem to recognize this, distinguishing *Intuitive Surgical*, a case that will be discussed later, by implying that the deception caused by IMGA was "unintended deception." (Pls.' Opp'n 11; *see also* Hr'g Tr. 50:2–4 ("[T]hey want to get extra credit for the fact they always agreed to fulfill their obligations as consultants."); *id.* 50:17–18 ("I'll give them they hoped, they hoped it would be built . . . .")).  Although a court may not weigh the evidence or make credibility determinations on a motion for summary judgment, *see Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996), it "need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible,'" *id.* at 743

(quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 593 (1986)).

Despite the absence of representations that IMGA would literally build or finance the development of an academy, the Plaintiffs have put forth specific facts supporting the proposition that they received "the misleading impression that an IMGA facility would be located at the Orlando Cay Clubs Resort and Academy" (Pls.' Opp'n 10), and, more importantly, that IMGA contributed to this impression, however benevolently that contribution may have been made, *see Sundance Apts. I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1222 (S.D. Fla. 2008) ("[U]nder Florida law it is sufficient . . . that a party directly participated in a violation of the FDUTPA, even if that violation was initiated by another." (citing *Williams v. Edelman*, 408 F. Supp. 2d 1261, 1275 (S.D. Fla. 2005); *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008)). IMGA's contractual obligations were limited. The consulting agreement required IMGA generally to give "advice and guidance regarding the design, establishment, management and operation of the Sports Complex," which DC720JV would develop. The license-and-cooperation agreement granted the right to IMGA and Cay Clubs to use each others' names in connection with the Project, and provided that the parties would work together to market their relationship. (It did not require Cay Clubs to give notice, conspicuous or otherwise, that Cay Clubs and IMGA were in a consulting relationship only.) In sum, IMGA's obligations under these agreements were limited to a specific role.

But when viewed in the light most favorable to the Plaintiffs, some of the materials IMGA helped create, standing alone or combined, could have given the impression that it would develop an IMGA sports academy at Orlando Cay Clubs, notwithstanding the fact that there were no *literal* promises or representations that IMGA would build it. One example is the March 22, 2007 press

Case No. 08-62076-CIV-ALTONAGA/McAliley

release called "IMG Academies and Cay Clubs — Perfect Match," different versions of which were displayed in brochures and on websites. (*See* DSOF ¶ 48). It describes how IMGA and Cay Clubs "joined forces to create a partnership." It states that "IMG Academies is known the world over *for the development and operation of state-of-the-art, multi-sport, training and education, camp and academy facilities*." (emphasis added). It states how "Cay Clubs will enable IMG Academies to reach, and accommodate, a much larger audience by creating new homes for IMGA facilities." It provides that "Cay Clubs can add to its host of amenities the world's leading athletic training, education, and wellness facilities." To be sure, there are no promises or representations that IMGA would build, finance, or develop a sports facility; in fact, on a close read it says Cay Clubs will "create new homes for IMGA facilities." But the Court simply cannot say as a matter of law that this press release (and it is just an example) was not likely to mislead a consumer acting reasonably in the same circumstances into forming the impression that IMGA, a company "known the world over" for the development of sport facilities, would develop an academy at Orlando Cay Clubs. *See Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1326 (M.D. Fla. 2007); *State, Office of Att'y Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. 1st DCA 2004); *Davis*, 776 So. 2d at 974.

IMGA asserts that even these representations are not actionable under the FDUTPA. Relying on *University of Miami v. Intuitive Surgical*, 166 F. App'x 450, IMGA contends that a promise of future action is not deceptive if a defendant did not have the intent not to keep its promise at the time the promise was made. (*See* Def.'s Mem. 13; Def.'s Reply 5). In *Intuitive Surgical* a university bought a robotic surgical system called Zeus from Zeus's manufacturer under an agreement calling

31

Case No. 08-62076-CIV-ALTONAGA/McAliley

for good-faith efforts to establish the university as a leading robotics-training center. Zeus's manufacturer merged with another manufacturer shortly thereafter, which later ceased funding and developing the Zeus system. Suing under, *inter alia*, the FDUTPA, the university alleged that Zeus's manufacturer knew when it signed the agreement that it would merge and that the other manufacturer, the defendant, would stop making Zeus systems. *See* 166 F. App'x at 453. But summary judgment was granted for the defendant, and later affirmed, because the two manufacturers "were not planning to merge when the [a]greement was signed." *Id.* There was no evidence that Zeus's manufacturer knew of the merger and Zeus's pending discontinuation when it signed the agreement. *Id.* at 453–54.

Although IMGA takes a broad reading of *Intuitive Surgical*,[12] the basic principle that IMGA asserts the case stands for — that promises of future action are not deceptive under the FDUTPA where a defendant did not intend not to keep its promise when the promise was made — has support in the law about the FDUTPA and fraud more generally. Regarding the FDUTPA, a complaint has been held properly to state a claim where "a business made an allegedly misleading advertisement by making an offer or promise which the advertiser *did not* intend to keep." *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (citing *Izadi v. Machado (Gus) Ford, Inc.*, 550 So. 2d 1135, 1140–41 (Fla. 3d DCA 1989) (emphasis added)). Accordingly, it may also be that a complaint does not state a claim where a business made a misleading advertisement by making a promise that

---

[12] The specific question was whether there was any evidence that Zeus's manufacturer knew of the merger and the system's pending discontinuation when the university and Zeus's manufacturer signed the agreement. There was not, and it was on that ground that the Eleventh Circuit affirmed on the FDUTPA count. In other words, the court affirmed because no facts substantiated the university's claim; the Eleventh Circuit cited no law for the proposition IMGA contends the case stands for.

Case No. 08-62076-CIV-ALTONAGA/McAliley

the business *did* intend to keep.  Regarding fraud, "a misrepresentation must ordinarily relate to a past or existing fact to be the basis of a claim for relief sounding in fraud," *Sleight v. Sun & Surf Realty, Inc.*, 410 So. 2d 998, 999 (Fla. 3d DCA 1982), and "[a] false statement amounting to a promise to do something in the future is not actionable fraud," *id.*  "An exception arises, however, where the promise to perform a material matter in the future is made without any intention of performing or is made with the positive intention not to perform." *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. 2d DCA 1985) (citing *Home Seekers' Realty Co. v. Menear*, 135 So. 402, 402–03 (Fla. 1931)).  The Plaintiffs are correct that an act or practice may be deceptive under the FDUTPA irrespective of a defendant's good faith or intent to deceive, *see Orkin v. Exterminating Co. v. FTC*, 849 F.2d 1354, 1368 (11th Cir. 1988); *Maine v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005); 5 JULIAN O. VON KALINOWSKI ET AL., ANTITRUST LAWS AND TRADE REGULATION § 78.12, at 78-42 (2009),[13] but IMGA's position on promises of future acts is not without support.[14]

Yet assuming this principle exists in Florida law, the Plaintiffs have nonetheless produced evidence supporting their impression that IMGA would build an academy at Orlando Cay Clubs, and that IMGA helped to create that impression.  Further, although IMGA may always have intended to fulfill its contractual obligations, IMGA did not intend to build, finance, or develop the academy because that was DC720JV's obligation under the consulting agreement.  A representation to the contrary fits within the exception to the general rule, and therefore would be actionable.  The

---

[13]  The Court must, in construing Section 501.204(1) of the Florida Statutes, give "due consideration and great weight" to interpretations of the Federal Trade Commission and the federal courts relating to 15 U.S.C. § 45(a).  *See* FLA. STAT. § 501.204(2).

[14]  Of course, actions under the FDUTPA and for common-law fraud are not the same, in part because a showing of reliance is not required to prevail under the FDUTPA.  *See Davis*, 776 So. 2d at 974.

Plaintiffs' counsel argued that this was a misrepresentation of present, and not future, facts, since IMGA contributed to the representation that it, as opposed to another entity, was going to build the academy. In other words, "[t]his was going to be their baby and it wasn't their baby." (Hr'g Tr. 50:9–10). Whether these representations are of present, as opposed to future, acts, the argument is essentially the same: IMGA allegedly misled the Plaintiffs that it would build the academy, even though it was never IMGA's intention to build one.

In sum, there is evidence that, when viewed in the light most favorable to the Plaintiffs, IMGA contributed to the representation that it would build an IMGA academy at Orlando Cay Clubs. In these materials, IMGA did not make itself known merely as a consultant; it marketed its expertise in developing and operating state-of-the-art sports-training facilities, and represented that it was in a partnership with Cay Clubs. While these representations may indeed be consistent with IMGA's contractual obligations, it does not follow that these representations were not likely to mislead the Plaintiffs as well. *Cf.* UNFAIR AND DECEPTIVE ACTS AND PRACTICES, *supra*, § 4.2.19.1, at 236 ("[D]eception can be found where there is no breach of contract or warranty.").

> b.      Partnership Representations

For three reasons, IMGA asserts it may not be held directly liable for any partnership representations under the FDUTPA. First, IMGA contends it never held itself out as being in a *legal* partnership with Cay Clubs, but rather used words such as "partner" and "partnership" only "in their colloquial sense to describe the collaborative nature of its relationship with Cay Clubs." (Def.'s Mem. 17; *see also id.* 14 n.4). Second, IMGA contends that "no Plaintiff could have reasonably relied on any such belief." (*Id.* 14 n.4). Third, IMGA contends the Plaintiffs' alleged damages arise

not because of the partnership representations, but because the property was never developed. According to IMGA, the Plaintiffs have produced no facts showing their "alleged injury was caused by the fact that IMGA had cooperation and consulting agreements — as opposed to a partnership agreement — with Cay Clubs."  (Def.'s Reply 6).

The first reason is unpersuasive.  IMGA repeatedly and consistently allowed its relationship with Cay Clubs to be referred to as a partnership, or some variance thereof, in advertisements.  (*See, e.g.*, PSOF ¶¶ 41–50 ("Cay Clubs is the real estate development partner for IMG Academies."); *id.* ("Cay Clubs is proud of its relationship with IMG Academies as its exclusive residential development partner and is pleased to offer you the opportunity to join this exciting partnership with the purchase of a Cay Clubs/IMG Academies resort property."); *id.* ("Two unique leaders in their respective fields, Cay Clubs and IMG Academies have joined forces to create a partnership . . . ."); Young Dep. 91:9–12 ("Did IMG approve of referring to the relationship at Orlando as a partnership[?]  Yes.  We used the word partnership for our entire relationship.")).  Thanks to these representations, the Plaintiffs allegedly believed a partnership existed between IMGA and Cay Clubs. (*See* PSOF ¶¶ 41–50; Hr'g Tr. 45:14–21).  While IMGA never represented or allowed itself to be represented as the *legal* partner of Cay Clubs, it is understandable how one, based on these representations, could form a different impression.  These statements and others like them are enough to create questions of fact about the Plaintiffs' belief that IMGA and Cay Clubs were in a partnership.  *See Pinnacle Port Cmty. Ass'n v. Orenstein*, 872 F.2d 1536, 1541 (11th Cir. 1989) (citing *Greenfield v. Cohen*, 432 So. 2d 574, 575 (Fla. 3d DCA 1983)); *see also Glazer v. Brookhouse*, 471 F. Supp. 2d 945, 949 (E.D. Wis. 2007); *Atlas Tack Corp. v. DiMasi*, 637 N.E.2d

Case No. 08-62076-CIV-ALTONAGA/McAliley

230, 233 (Mass. App. Ct. 1994); *Springer v. Opsahl*, 744 P.2d 884, 889 (Mont. 1987); *Sparks & Co. v. Hawks*, 83 P.2d 981, 982 (N.M. 1938).

IMGA relies on *Bertin Steel Processing, Inc. v. United States Steel Corp.*, 1:02 CV 1669, 2005 WL 2205332 (N.D. Ohio Sept. 6, 2005), and *Glazer v. Brookhouse* in support of its second reason — that the Plaintiffs' reliance was not reasonable because Plaintiffs knew nothing about the financial condition of IMGA.[15]  In *Bertin Steel* the plaintiff sued three companies — USX, Kobe, and KDI — for fraud, breach of fiduciary duty, and apparent-partnership liability.  2005 WL 2205332, at *1.  The plaintiff alleged that USX and Kobe were the actual partners of USS/Kobe, a business venture with which the plaintiff contracted.  The plaintiff alleged that USX and Kobe, as partners, had a duty to disclose a pending merger of USS/Kobe with another steel company, which ended up in bankruptcy.  According to the plaintiff, USX and Kobe misrepresented they were the actual partners of USS/Kobe, which induced the plaintiff to enter into a contract to its detriment. *Id.* at *10.  The court concluded that the plaintiff was precluded under the contract from holding either USX or Kobe liable.

> [A]ny reliance it had upon the presumed general partnership of USX and Kobe to USS/Kobe was not a reliance upon those defendants' status as partners, *per se*, but upon their financial resources to which [the plaintiff] might have recourse.  [The plaintiff], however, provides no material evidence that such a reliance was reasonable.  Indeed, clear evidence argues otherwise, where [the plaintiff] contracted away any recourse it might have had against the partners for such financial support in [the contract].

---

[15]  To be clear, actual reliance is not an element under the FDUTPA.  *See Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567 (11th Cir. June 3, 2009) ("[T]he FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct."); *Davis*, 776 So. 2d at 974.  The question, rather, is whether a deceptive trade practice "was likely to deceive a consumer acting reasonably in the same circumstances." *Id.*

*Id.* at *11 (footnote call number omitted).

In *Glazer* the plaintiff sued a law firm and the defendant, whose name was listed on the firm's letterhead, for damages arising out of the negligent handling of his mother's trust. 471 F. Supp. 2d at 946–47. In fact the defendant was not a partner of the law firm, and the firm was not a partnership. According to the plaintiff, if he had known the defendants were not partners or had no malpractice insurance, he would not have allowed them to work for his mother. *Id.* at 948. Thus the plaintiff sought to hold the defendant vicariously liable. Although the court determined that the plaintiff could reasonably believe, based on the letterhead, that the firm was a partnership, *see id.* at 949, "absent additional facts, [the plaintiff] could not in good faith rely upon the partnership form as a basis for inferring that the firm had financial solidity merely because of its status as a partnership," *id.* at 950.

According to IMGA, *Bertin Steel* and *Glazer* compel a similar result here because the Plaintiffs have presented no evidence that they knew of IMGA's financial resources. (*See* Def.'s Mem. 18). Nor have they presented evidence that they believed IMGA's participation as a partner, as opposed to some other form of relationship, would increase the financial viability of the Project. (*See* Hr'g Tr. 57:9–24). Without this knowledge, IMGA contends, the Plaintiffs' reliance on the partnership of Cay Clubs and IMGA was unreasonable.

Partnership status *per se* may mean little where the person relying on the status knows nothing about the financial wherewithal of the partnership. *See Bertin Steel*, 2005 WL 2205332, at *11; *Glazer*, 471 F. Supp. 2d at 950. But *Bertin Steel* and *Glazer* are distinguishable, and the Plaintiffs have presented some facts suggesting they knew something about the financial status of

Case No. 08-62076-CIV-ALTONAGA/McAliley

IMGA — even though their knowledge was based on certain inferences. The chief basis for the outcome in *Bertin Steel* was the plaintiff's signing a contract under which it explicitly waived the right to seek financial resources from the general partners. 2005 WL 2205332, at *6, *11. It was therefore unreasonable to rely on the partnership form or financial resources of USX and Kobe because, even if they were partners, the plaintiff had previously agreed not to hold the partners liable. There is no comparable contract or agreement here. *Glazer* is more in line with this case. But in *Glazer* the plaintiff transacted with an inconspicuously named law firm of only a few attorneys. 471 F. Supp. 2d at 947. There was no basis to believe that the firm had "financial solidity" based solely on the alleged partnership status, and therefore it was unreasonable to rely solely on that status in hiring the firm to perform legal services.

IMGA, on the other hand, is an established company with considerable name recognition. Indeed, "[t]he IMG name is similar to Disney in the real estate market," the Plaintiffs' real-estate expert, Jack McCabe, wrote in his report. Each Plaintiff, based on IMGA's "marketing materials and websites," received the same impression:

> This partnership and IMGA's involvement in the project was extremely important as the involvement by IMGA and their reputation and expertise made this property marketable and distinctive. The marketing materials and websites I viewed created a strong impression that IMGA was a large and successful company . . . . The apparent financial success of IMGA was a big factor in my decision to purchase my unit. . . . If I had been told there was no partnership . . . I would not have purchased my unit.

(*E.g.*, Chan Decl. ¶¶ 8–9).

It is true that the Plaintiffs' purchase money would be used "to do the conversion and develop the property" (Second Am. Compl. ¶ 237), and that, as IMGA argues, "[t]here's no allegation that

38

Case No. 08-62076-CIV-ALTONAGA/McAliley

they thought IMGA was going to be providing funding for this project" (Hr'g Tr. 60:21–23).  But this does not significantly weaken the Plaintiffs' argument; the Plaintiffs or similar consumers may have relied on IMGA's apparent ability to contribute if, for example, the Project was budgeted incorrectly, or if the Defendants squandered the purchase money through inefficient spending.  The Court cannot conclude that these representations were not "likely to deceive a consumer acting reasonably in the same circumstances."  *Davis*, 776 So. 2d at 974.

Last, the Plaintiffs contend there are two components of causation.  The first, as has been discussed and of which there is sufficient evidence, is that the Plaintiffs would not have bought their units if they had known there was no partnership.  (*Id.* 45:14–21).  "The other component of causation is the increased prospects, if not certainty, that this would have been built had there been a real partnership." (*Id.* 45:25–46:3).  IMGA asserts that the partnership statements, as the allegedly deceptive acts, must have caused the Plaintiffs' damages.  *See Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007).  IMGA contends, however, that the Plaintiffs' alleged damages arise not because of the partnership representations, but because the property was never developed.  (*See* Def.'s Reply 6).

On the latter component of causation, the Plaintiffs put forth an e-mail exchange between Harvey Birdman of Sunvest and Greg Breunich of IMGA wherein the parties tried to determine what to do about the Project after Cay Clubs had appeared to collapse.  "We need a joint effort to get these deals going," Birdman wrote to Breunich on October 7, 2007.  "We will have to make the Orlando plan a reality."  On November 19, 2007, Breunich wrote to Birdman, "IMGA is committing to creating and operating its field sports complex in Orlando."  Birdman responded, "We want to make

certain, that what we promise to our buyers will exist, namely an IMGA sports field academy."

Testifying later about the e-mails, Birdman said he was trying to get IMGA and others to come up

with money to complete the Project. When they did not, "that was the end of the project." (Birdman

Dep. 303:14–16, June 8, 2009).

The Plaintiffs seek as damages "the difference between [the] value of the units in the

condition they were delivered and the value of the units in the condition they should have been

delivered according to the representations in the marketing and sales materials." (Second Am.

Compl. ¶¶ 259, 268). IMGA correctly states the Project may not have been developed, and therefore

the Plaintiffs still would have suffered their alleged damages, whether a partnership existed or not.

(Hr'g Tr. 56:1–4). But Florida law makes all partners "liable jointly and severally for all obligations

of the partnership." FLA. STAT. 620.8306(1). The e-mails between Sunvest and IMGA suggest they

deliberated seriously about whether to complete the Project without Cay Clubs and, based on

Birdman's testimony, decided not to because IMGA and others would not "put money up."

(Birdman Dep. 302:16). If the Defendants had been partners in the Project, there is a greater

likelihood they would have "put money up" to conclude the Project because each partner would have

been liable for the partnership's obligations. The decision to abandon the Project would have been

harder and perhaps costlier.

On this element of causation, the Plaintiffs have to show they were actually aggrieved by the

unfair or deceptive representation. *See Shibata v. Lim*, 133 F. Supp. 2d 1311, 1317 (M.D. Fla.

2000); *cf. Kais v. Mansiana Ocean Residences, LLC*, No. 08-21492-Civ, 2009 WL 825763, at *2

(S.D. Fla. Mar. 26, 2009) (finding second element of a FDUTPA claim, causation, not satisfied

Case No. 08-62076-CIV-ALTONAGA/McAliley

where "[n]owhere in the Second Amended Complaint does Plaintiff state these alleged deceptive acts caused him to enter into the contract with Defendant or caused him to act differently in any way . . . ."). Viewing the evidence in the light most favorable to the Plaintiffs, there is a disputed issue of whether IMGA would have developed the Project if it had been in a partnership with Cay Clubs.

     2.    *Vicarious Liability*

For three reasons, IMGA contends that it may not be held vicariously liable for the acts of Cay Clubs. First, IMGA asserts Cay Clubs is exempt from FDUTPA liability because of the real-estate exemption of Section 501.202(6) of the Florida Statutes. Second, IMGA asserts that the Plaintiffs cannot have reasonably relied on the partnership representations as a matter of law, and therefore do not meet the elements of Florida's purported-partnership statute. Third, IMGA asserts that the purported-partnership statute does not apply because the only entity with which the Plaintiffs transacted was DC720JV, and the statute applies only where a plaintiff "enters into a transaction with the actual or purported partnership." FLA. STAT. § 620.8308(1). Because the Plaintiffs in fact did not transact with the purported partnership, the Court does not address IMGA's first and second reasons.

Florida's purported-partnership statute provides:

> If a person, by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons who are not partners, the purported partner is liable to a person to whom the representation is made if such person, relying on the representation, enters into a transaction with the actual or purported partnership.

*Id.* There was no *actual* partnership here among any of the relevant parties. Thus, for liability to attach, the Plaintiffs must show (1) IMGA, by words or conduct, purported to be a partner, or

41

consented to being represented by another as a partner, in a partnership or with persons who are not in fact partners; and (2) the Plaintiffs, relying on the representations, transacted with the purported partnership.  *See id.*; J. WILLIAM CALLISON & MAUREEN A. SULLIVAN, PARTNERSHIP LAW AND PRACTICE § 5:25 n.1 (2009).

On the first element, there is sufficient evidence that IMGA purported to be in a partnership with Cay Clubs, even though the parties were not in fact partners.  *See supra* Part III.B.1.b.  There is no evidence or allegation, however, that IMGA purported to be in a partnership with DC720JV.  The Plaintiffs "believed that DC720JV, LLC was an entity *affiliated* with Cay Clubs and IMGA and was simply an entity established for purposes of transferring our units to us."  (*E.g.*, Chan Decl. ¶ 10 (emphasis added)).  But, to be clear, the purported partnership is between IMGA and Cay Clubs.

On the second element, putting the question of reliance aside, none of the Plaintiffs entered into a transaction with the purported partnership itself.  The only transactions they entered into were the purchase-and-sale agreements with DC720JV (which, incidentally, only mentioned DC720JV, did not mention IMGA, and contained an integration clause).  It would therefore appear that the statute does not apply.

According to the Plaintiffs, however, this argument is flawed since "either an agent or individual partner can contract on behalf of a partnership even though the partnership is not named." (Pls.' Opp'n 16 (citing *Xanadu of Cocoa Beach, Inc. v. Zetley*, 822 F.2d 982, 985 (11th Cir. 1987); 8B FLA. JUR. 2D *Business Relationships* § 557)).  But these authorities state only that a *partner* can enter into a contract on behalf of the partnership even if the contract does not mention the partnership by name.  *See Zetley*, 822 F.2d at 985 n.2 ("[I]f a partnership led a third party to believe that it would

Case No. 08-62076-CIV-ALTONAGA/McAliley

honor a contract not naming the partnership *and signed by only one partner*, then the partnership should be held estopped from denying its liability." (citing FLA. STAT. § 620.575(2) (West 1977) (emphasis added)); *Business Relationships*, *supra*, § 557, at 295 ("When *a partner* executes an instrument individually, the partnership will be bound if the signing partner intended the partnership to be bound. Therefore, a contract does not need to . . . even mention the name of the partnership . . . ." (emphasis added)). Neither authority discusses whether an agent of an *individual* partner (or even whether a non-partner agent of the partnership) can do the same. Yet even if this principle applies to a non-partner agent of a partnership, it does not follow that it also applies to an agent of an individual partner. That is because a partner, by law, "is as an agent *of the partnership* for the purpose of its business." FLA. STAT. § 620.8301(1) (emphasis added). The Court is unaware of, and the Plaintiffs have not cited, any authority for the proposition that an agent of an individual partner is, like a partner, an agent of the partnership as well. Accordingly, even if "a jury could find that it was reasonable for Plaintiffs to believe DC720JV was acting on behalf of Cay Clubs" (Pls.' Opp'n 16), the Plaintiffs have presented no evidence that they believed DC720JV was acting on behalf of or as an agent of the IMGA–Cay Clubs purported partnership. Indeed, all but two[16] of the Plaintiffs entered into the purchase-and-sale agreements with DC720JV "without having any familiarity with

---

[16] Loretta Neil said the title company told her DC720JV was "a joint venture/partnership of Cay Clubs, Sunvest and IMG." (Neil Dep. 170:24–25). But because DC720JV's articles of organization were filed with the Florida Department of State on March 24, 2006, *i.e.*, before Neil bought her unit, this belief was unreasonable as a matter of law. *See* Fla. Stat. § 608.407(5) ("[T]hat articles of organization are on file with the Department of State *is notice* that the entity formed in connection with the filing of the articles of organization is a limited liability company formed under the laws of this state." (emphasis added)). Linda Palmer looked up DC720JV on the Florida Secretary of State website, but she made no inquiry into whether it had anything to do with IMGA. (*See* Palmer Dep. 121:1–122:18).

43

Case No. 08-62076-CIV-ALTONAGA/McAliley

that entity" and "whether it had any relationship with IMGA."  (DSOF ¶ 24[17]; Hr'g Tr. 84:21–23).

## IV.  CONCLUSION

Consistent with the analysis herein, it is

**ORDERED AND ADJUDGED** as follows:

The Motion **[D.E. 171]** is **DENIED IN PART** and **GRANTED IN PART**.  It is

a.        **DENIED** to the extent it seeks summary judgment on direct liability.

b.        **GRANTED** to the extent it seeks summary judgment on vicarious liability.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of February, 2010.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:        counsel of record

---

[17] Although the Plaintiffs discuss the knowledge (or lack thereof) Birdman, Wooldridge, and O'Ryan had with DC720JV (*see* PSOF ¶ 24), they provide no specific references to the file creating an issue of fact in regard to any of the Plaintiffs' knowledge.  *See* S.D. FLA. L.R. 7.5 C.2.