UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-62076-CIV-ALTONAGA

Magistrate Chris M. McAliley

WALTER GASTALDI, an individual,
DANIEL FISHER, an individual, MARK
MOSES, an individual and KIMBERLY
JONES, an individual, *et al.,*

    Plaintiffs,

vs.

SUNVEST RESORT COMMUNITIES, LC, a
Florida limited liability company, and E.W.
SUNVEST DEVELOPMENT, LLC, a
Delaware limited liability company; and
IMG Academies, LLP, a Florida limited
Liability partnership, d/b/a IMGA,

    Defendants.
_____ /

### PLAINTIFFS' SUPPLEMENTAL MEMORANDUM REGARDING THE EXCLUSION OF EXPERT TESTOMY AT TRIAL

Pursuant to the Court's direction at the February 9, 2010 pre-trail conference and hearing on the parties' motions *in limine*, Plaintiffs file this supplemental memorandum addressing issues raised concerning the calculation of damages in this case, and the admissibility of the expert testimony of Michael O'Rourke.

### I. O'Rourke's and Dudney's Conflicting Opinions

This case presents a classic situation of dueling experts who agree in principle to the measure of damages (the difference in value between what Plaintiffs paid for and what they

received) but who disagree on the facts that should be considered when calculating the damages. Both parties have moved to exclude the testimony of the opposing party's damages expert.

### Plaintiffs' Expert – Michael O'Rourke

Plaintiffs' damages expert Michael O'Rourke calculates each Plaintiff's damages as the difference in value between what that Plaintiff paid for a unit and what was actually received at the time of closing[1]. The difference represents that part of the purchase price attributed to the misrepresentation that the units would be income producing units within an IMGA sports academy as opposed to ordinary condominium conversion units. To make this calculation, however, it is necessary to determine the value of the unit as an ordinary condominium conversion at the time of closing. O'Rourke calculates this value by taking the undisputed current value of the units (still in the undeveloped state) and applies a regression analysis using the fact that these units in their undeveloped state have experienced a 60-70% decline in value due to the overall real estate market decline in value for condominium conversions. For example, accepting the opinion that a condominium conversion unit with a current market value of $32,000 reflects a 66.9% decline in market value from 2007, O'Rourke can arrive at the value of the unit two years earlier by dividing the current value by 1-% of the decline. Therefore, a condominium conversion unit with a current market value of $32,000 would have had a market value of $96,677 in 2007, which is 66.9% more than it is worth now. After making this calculation, O'Rourke then takes that value and subtracts it from the purchase price paid at

---

[1] The measure of damages in a FDUTPA claim is the difference between the value of the product that should have been delivered and the value of the product that was delivered. *See, e.g., Coghlan v. Wellcraft Marine Corp.*, 240 F. 3d 449, 453 (5th Cir. 2001) (addressing and applying Florida law); *H & J Paving of Florida, inc. v. Nextel, Inc.*, 849 So. 2d 1099, 1102 (Fla. 3d DCA 2003); *Fitzpatrick v. General Mills, Inc.*, Case No. 09-CV-60412-HUCK, D.E. 97 at 9 (S.D. Fla. Jan 11, 1020). Here, Plaintiffs were promised and paid for condominium conversion units that were to be refurbished and become part of an IMGA soccer and field sports academy. What was actually delivered at closing were the un-refurbished condominium units, which is what Plaintiffs still have.

closing to arrive at the amount of the purchase price that represents the value of what was not received. *See* Exhibit A.

### IMGA's Rebuttal Expert – Louis Dudney

IMGA's rebuttal expert Louis Dudney, who admits he is not attempting to calculate FDUPTA damages and offers no methodology of his own, including no formula to calculate the value of the units at closing, believes O'Rourke should consider as part of his damages calculation the hypothetical value of the units had the property been developed into an IMGA sports academy, reduce that value by the decline in value for condominium conversions, and then calculate the damages two years later rather than at closing. But the property was not developed into an IMGA sports academy. Because Dudney incorporates unsupported hypothetical values and speculation into the calculation of damages and no case supports applying a hypothetical market decline to a nonexistent property for the purposes of calculation damages under FDUPTA, Plaintiffs moved to exclude his testimony at trial. (D.E. 212), The motion remains pending before the Court.

IMGA likewise moved to exclude O'Rourke under *Daubert*. IMGA, however, does not challenge O'Rourke's qualifications, his data or his math, but rather argues that O'Rourke does not consider certain facts Dudney opines should be considered in calculating the damages, namely a hypothetical value of the units had they been developed as promised (calculated by applying the decline in value for ordinary condominium conversions), and at what point in time damages should be calculated.[2] [D.E. 215] As set forth next, this is not a proper *Daubert* challenge, going instead to weighing Dudney's credibility against O'Rourke's.

---

[2] IMGA also contends that that Mr. O'Rourke's analysis is flawed because the value of what was supposed to be delivered should be constrained by the "as is" clause in the Purchase and Sale Agreements. The Court, however, has already held that IMGA, as a nonparty, and one that claimed not to be bound by the contract and its arbitration clause to boot, is not entitled to claim any benefit from the contract's "as is" and disclaimer clauses. *Galstaldi v.*

## II. **Daubert**

As a general rule, disagreements regarding the facts considered by an expert in making his conclusion as to damages go to the credibility of the expert's testimony, which is the sole province of the jury to determine. It is not a basis to exclude the testimony at trial under a *Daubert* challenge, as IMGA attempts to do. As this Court recently held, a *Daubert* inquiry goes only to methodology, and not to the correctness of the expert's conclusions which are properly raised at trial through cross examination:

> "[W]holesale exclusion" of expert testimony is disfavored. *Daubert*, 509 U.S. at 596. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (*citing* Rock v. Arkansas, 483 U.S. 44, 61 (1987). Any "[d]oubts regarding whether an expert's testimony will be useful should generally be resolved in favor or admissibility." *Miles v. Gen. Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001)(internal quotations and citations omitted). The proponent does not need to prove that the expert's conclusions are correct, but only that the expert's conclusions are reliable. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). Reliable expert testimony may be admissible despite the other party's contention that the expert's conclusions are incorrect.

*MCZ/Centrum Flamingo II, LLC*, 08-22419-CIV-Altonaga/Brown, August 3, 2009, Omnibus Order, Doc. 196 at page 4 of 13; s*ee also i4i Limited Partnership v. Microsoft Corporation*, 589 F.3d 1246, 1269-71 (Fed. Ct. App., 2009) (Defendant's disagreements are with expert's conclusions and not his methodology. Questions about which facts are most relevant to calculate damages are for the jury who should hear each expert's testimony and decide for itself what to accept and reject).

---

*Sunvest Communities USA, LLC,* 637 F. Supp. 2d 1045, 1054-1056 (S.D. Fla. 2009). Beyond this, the Court also held that the clauses did not undercut the separate representations concerning the nature of the project because they did not expressly and specifically address and contradict them. *Id.* at 1063. So the clauses cannot be used by IMGA to claim that all the Plaintiffs only expected or were entitled to an un-refurbished unit in a run-down apartment complex when they paid between $300,000 and $500,000 per unit —a contention that is absurd on its face anyway. The issue is the subject of point IA of IMGA's omnibus motion *in limine,* and IMGA "stood on its papers" at the pretrial conference.

In this case, Dudney simply has a different opinion on what facts O'Rourke must consider in calculating damages. That is a credibility challenge that the jury can either accept or reject. IMGA can raise the facts Dudney believes O'Rourke should have considered during its cross examination of him at trial, and then in its closing try to persuade the jury what it believes is its more credible calculation of damages. *See, e.g., Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1344-1345 (11th Cir. 2003) (dispute regarding misuse or application of otherwise reliable methodology best tested by adversary process); *Fisher v. CIBA Specialty Chemicals Corp.,* 2007 WL 2302470, *6-7, 12-15 (S.D. Ala. Aug. 8, 2007) (disputes between experts regarding whether air modeling or dust sampling was the correct way to determine the source of DDT contamination, and whether a forward looking EPA model could be used in reverse to determine the need for remediation, best left for the jury to resolve by determining which approach is the most persuasive); *see also Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (The Court's "gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury.")

### III. No Windfall – Just Faulty Analysis by Dudney

IMGA also argues that O'Rourke's damages calculations, if accepted by the jury and awarded to Plaintiffs, will confer a windfall. As Mr. Putnam argued at the hearing, O'Rourke is "awarding damages to Armstrong and to each of the plaintiffs for losses actually caused by the changes in the market. … If you put the plaintiff in a better position than they would have been in but for the misconduct, you've got a windfall." *See* Hearing Transcript at p. 15. We agree with the principle that a plaintiff should not recover a windfall, but strongly disagree that O'Rourke's calculations confers a windfall on any of the Trial Group Plaintiffs. Here is why.

5

IMGA's argument begins with the unsupported conclusion that the current market value of the units, *had the property been developed as promised,* would be a whopping 70% less than what was paid. That is pure speculation, and based on the unsupported assumption that the purchase price paid for the unit was the result of the real estate bubble rather than the future market value of an income producing unit within an IMGA sports academy. That argument also uses a value for the market decline that applies only to ordinary condominium conversions, not income producing real estate, or property comparable to what was promised to be developed. In fact, an argument can be made that units may have been worth the same or even more in 2009 despite the general decline in real estate values. The average purchase price paid for a unit at the Orlando Cay Clubs Resort and Academy was $350,000. Had the property been developed into an IMGA sports academy and complex the only comparable units to establish value would be the condominium units at IMGA's Bradenton campus. As shown by the sales report attached as Exhibit 4 to Dudney's Rebuttal Expert Report, one unit at Bradenton was sold in 2009 for over $600,000, considerably more than $350,000.[3]

The reason this formula is attractive to IMGA, of course, is that the value added to the unit from being part of an IMGA sports academy is more than double the value of the unit in its undeveloped state, so that reducing both the purchase price and the actual value of the unit at closing by the same percentage and recreating the transaction in today's dollars, narrows the gap between the two values and lessens Plaintiffs' damages. The problem, however, is that there is no FDUTPA case holding that this approach is permissible, which is not surprising since it fails to address the FDUTPA measure of damages and amounts to an attempt to use market decline to lessen damages rather than to eliminate its effect from the calculation.

---

[3] The other units listed in Exhibit 4 to Dudney's Rebuttal Expert Report that he claims represents a decline in value were in fact short sales rather than arms length sale transactions, and cannot be used to establish the hypothetical market value of Plaintiffs' units had the property been developed into a IMGA sports academy as promised.

FDUTPA damages, like those in various other contexts, focus on the difference in value between what was promised and received at the time of the transaction. When this is the measure of damages, what happens to market value of the property after the transaction is irrelevant. Indeed, a case cited and relied upon by IMGA's principal case, *Morgan Stanley & Co. v. Coleman (Parent) Holdings, Inc.,* 955 So. 2d 1124 (Fla. 2007), makes that very point. *See Totale, Inc. v. Smith,* 877 So.2d 813, 815 (Fla. 4th DCA 2004) ("Later appreciation or depreciation of the property that is the subject of the false representation generally does not alter the fraud damage computation.") In fact, the plaintiff in *Coleman* got into trouble and lost its judgment by using the kind of approach IMGA wants to use, attempting to measure damages based on later market values because it was "locked-up" and exposed to the market for a period of time the way IMGA tries to use later valuations based on the time Plaintiffs would have been exposed to the market while the development was being built. The Florida Supreme Court, however, held that the measure of damages remains the same, i.e., "the difference between the value of the property as represented and the actual value of the property on the date of the transaction," and reversed because the plaintiff failed to prove the actual value of the stock it got on the date of the transaction. 877 So.2d at 1128, 1131.

Unlike the Plaintiff in *Coleman*, Plaintiffs in this case are not seeking the difference in value between what was paid and the current value of the unit. That would improperly include the decline in market value for the undeveloped condominium conversion unit which Plaintiffs did not intend to buy but are nonetheless stuck with. Instead, O'Rourke provides evidence of the value of the property each Plaintiff received by using its actual, appraised value and a regression analysis to convert that to the higher value on the date of closing—just what *Coleman* requires. Dudney, on the other hand, falls into the trap of today's dollars, reducing the purchase price to

Case 0:08-cv-62076-CMA   Document 249   Entered on FLSD Docket 02/16/2010   Page 8 of 11

reflect the current state of the market and then subtracting the current value of the unfinished units from that to produce the difference in value in today's dollars. Again, no case IMGA has cited or that Plaintiffs have found holds that it can or should be done that way.[4]

The second flaw in IMGA's windfall argument is that it ignores the big picture, which includes such things as legally binding loan obligations each Plaintiff has relating to the purchase and the out-of-pocket costs paid to acquire and carry the unit. By taking these numbers out of the equation, IMGA creates the appearance of a windfall that in fact would not exist under either expert's calculations.[5] By way of the main example used by IMGA at the hearing (*see* Exhibit B), Plaintiffs Copland and Hill paid $326,976 to purchase unit 4236. IMGA argues that had everything gone according to plan and IMGA built the promised academy, unit 4236 would today be worth only $99,667 based upon the real estate market decline. However, O'Rourke awards them $277,130, which would be a windfall. *See* Hearing Transcript at pp. 31; 40-41.

The facts are much different. Copland and Hill paid $326,976 to purchase the unit and also paid over $52,000 in out-of-pocket expenses. Therefore, the total amount paid by these Plaintiffs is almost $380,000 for a unit with a current value of $24,000. O'Rourke's damage calculation does not provide Copland and Hill with the difference between what was paid and what the unit is worth today, but rather calculates the difference in values at the time of closing disregarding the approximately $52,000 additional out-of-pockets closing costs, growing interest

---

[4] With the exception to references to some general principles of damages, which are not in dispute, the other cases IMGA cites did not involve comparable issues. *Laney v. American Equity Inv. Life Ins. Co.,* 243 F. Supp. 2d 1347 (M.D. Fla. 2003 (measure of damages in a churning case); *MCI Worldcom Network Services, Inc. v. Mastec, Inc.,* 995 So. 2d 221 (Fla. 2008) (whether loss of use damages can be recovered for damaged fiber optic cables that were not needed); *Robbins v. Koger Properties, Inc.,* 116 F. 3d 1441 (11th Cir. 1997); *Missouri Pacific Railroad Co. v. H. Rouw Co.,* 258 F. 2d 445 (5th Cir. 1958) (required brokerage commissions should be deducted from difference in value of goods damaged in shipment).

[5] The Court already rejected IMGA's speculative argument that these loan obligations might never be paid and should not be considered when calculating damages. *See* Hearing Transcript at p. 51

8

on the loan, and other ongoing expenses related to carrying the property for the last two years (out-of-pocket damages that could have been recovered under the fraudulent inducement claim which is no longer in the case). Thus, even if awarded the approximately $250,000 difference in value between what the unit was worth at closing as an ordinary condominium conversion and its value as an income producing unit within a functioning IMGA sports academy under O'Rourke's formula, Copland and Hill will still have lost over $125,000, on a condominium purchase they would not have made in the first place had there been no misrepresentations. This is the same situation for all of the Plaintiffs, whether they recover under O'Rourke's or Dudney's damage formula.

   The final flaw in IMGA's windfall analysis has to do with the treatment of the leaseback payments some of the Plaintiffs received. Plaintiffs have moved *in limine* to exclude evidence of the leaseback payments because consideration of those payments in a difference in value measure of damages analysis – the FDUTPA measure of damages - is wrong on multiple counts. [D.E. 212 at 9-11.] First, the leaseback payments are irrelevant. Plaintiffs were supposed to get refurbished condominium units in a deluxe resort built around an IMGA field sports academy *plus* leaseback payments, and instead they got un-refurbished condominium units in an old apartment complex *plus* leaseback payments. Since Plaintiffs were entitled to receive them either way, the leaseback payments in no way speak to the difference in value between the units they received and were supposed to receive, and cannot be used to narrow that gap.

   Indeed, what IMGA is doing—and this is the second flaw in their argument—is conflating benefit of the bargain damages with out-of-pocket damages. The two cannot be mixed and matched to suit IMGA's purposes, just like Plaintiffs cannot seek difference in value damages plus out-of-pocket losses like interest payments, penalties, etc. The measure is one or

9

the other, *e.g., Coleman,* 995 So.2d at 1128, and under FDUTPA it is the difference in value between what Plaintiffs were supposed to get and what they actually got.

Third, the leaseback payments were compensation received in a separate transaction entered into well after closing with a collateral entity (CC720, LLC) for separate consideration, i.e. the leases themselves. So, again, they are irrelevant to the difference in value between what Plaintiffs received and were supposed to receive. Indeed, IMGA uses the same argument against Plaintiffs in seeking to exclude from the purchase price the $20,000 mandatory club membership fee each Plaintiff paid to Cay Clubs at closing.

## Conclusion

IMGA's motion *in limine* seeking to exclude any portion of Michael O'Rourke's testimony should be denied, the Daubert challenge should be rejected, and the question of the credibility of the damages calculation should be left for the jury

Respectfully submitted this 16th day of February, 2010.

Respectfully submitted

KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce De Leon Blvd., 9th Floor
Coral Gables, Florida  33134
Tel: 305-372-1800 / Fax: 305-372-3508

By: __/s/ Adam M. Moskowitz_____
  Harley S. Tropin, Esq. (Fla. Bar No. 241253)
  Adam M. Moskowitz (Fla. Bar No. 984280)
  Gail A. McQuilkin, Esq. (Fla. Bar No. 969338)

And

James B. Tilghman, Jr., Esq.
STEWART TILGHMAN FOX & BIANCHI, P.A.
One Southeast Third Avenue, Suite 3000
Miami, Florida  33131
Tel:  305-358-6644 / Fax: 305-358-4707

      And

      Keith T. Belt, Esq. / Chris Cantrell, Esq.
      BELT LAW FIRM, P.C.
      Lakeshore Park Plaza, Suite 208
      2204 Lakeshore Drive
      Birmingham, AL 35209
      Tel: 205-933-1500 / Fax: 205-933-5500

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the foregoing has been served electronically on all counsel of record on February 16, 2010, via the Notices of Electronic Filing generated by CM/ECF.

      By: /s/ Adam M. Moskowitz_____

309,910.1