# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## CASE NO. 08-62076-CIV-ALTONAGA/McAliley

**WALTER GASTALDI**, *et al.*,

     Plaintiffs,

vs.

**SUNVEST RESORT COMMUNITIES, LC**,
*et al.*,

     Defendants.

_____/

## ORDER

**THIS CAUSE** came before the Court on the Plaintiffs' Motion to Bifurcate Liability and

Damages for Trial or, Alternatively, Continuance of Trial (the "Motion") [D.E. 264], filed March

6, 2010.  The Court has carefully reviewed the parties' submissions, arguments presented on March

8 and March 9, and the applicable law.

## I.  BACKGROUND

In 2006 and 2007 the Plaintiffs, more than 200 persons from across the United States, paid

an entity of Cay Clubs International, LLC ("Cay Clubs") approximately $350,000 each for a unit in

an apartment complex that would be developed, along with the surrounding property, into the

Orlando Cay Clubs Resort and Academy ("Orlando Cay Clubs"): "a five-star resort community with

high-end luxury condominiums and a state-of-the-art sports facility."  *Gastaldi v. Sunvest Resort

Cmtys.*, No. 08-62076-CIV, 2010 WL 457243, at *1 (S.D. Fla. Feb. 3, 2010).  Cay Clubs and the

Defendants, Sunvest Resort Communities, LC, Sunvest's subsidiaries and affiliates, and IMG

Academies ("IMGA"), allegedly misrepresented themselves as partners in the development of

Case No. 08-62076-CIV-ALTONAGA/McAliley

Orlando Cay Clubs and misrepresented their respective obligations and involvement in its development.  When Cay Clubs and the Orlando real-estate market collapsed in late 2007, the Defendants abandoned the project.  The Plaintiffs were not refunded their money, their units were never renovated, and the sports facility was never built.  The Plaintiffs filed suit in state court in November 2008, alleging the Defendants, in connection with the marketing and promoting of Orlando Cay Clubs, are liable for damages under the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201–501.203, Florida Statutes.[1]

In December 2008 the Defendants removed the case to the U.S. District Court for the Southern District of Florida under 28 U.S.C. § 1332(d)(2).  After the Court decided the case belonged in federal court, *see Gastaldi v. Sunvest Cmtys. USA, LLC*, 256 F.R.D. 673, 677 (S.D. Fla. 2009), the issue of how best to manage the case — one made up of over 200 Plaintiffs, about 175 separate purchases, and many individual issues — needed to be determined.  To further that goal, the Court held a case-management conference in March 2009.  After receiving different proposals from the parties, the Court decided, based on its experience handling a mass-tort action consisting of 400 plaintiffs in *Conigliaro v. Norwegian Cruise Line Ltd.*, No. 1:05-cv-21584-CMA (S.D. Fla. filed June 14, 2005), to separate the Plaintiffs into smaller trial groups.  All issues would be tried in each group.  This approach offered manageability, finality, certainty in terms of time and budgeting, and limited the scope of and need for discovery in the later trial groups.  (*See* Hr'g Tr. 20:13–23:2, Mar. 12, 2009).  Moreover, depending on the outcome of the first trial group, the parties could make

---

[1]  The Plaintiffs also brought claims for damages and rescission for fraudulent inducement, conversion and civil theft.

Case No. 08-62076-CIV-ALTONAGA/McAliley

better decisions about settlement or proceeding with the rest of the claims.  (*See id.* 22:8–17).
Consistent with the scheduling order of February 2009 (*see* [D.E. 32]), the Court stated that, with
regard to the first trial group, it wanted discovery completed by October 2009 and the case tried in
February 2010 (*see* Hr'g Tr. 37:2–16, Mar. 12, 2009).  Plaintiffs ultimately selected a group of 33
members for the first trial group.  (*See* Hr'g Tr. 29:24–30:4, Apr. 27, 2009).

On September 14, 2009, the Plaintiffs disclosed four expert reports to the Defendants, one
of which, prepared by Michael O'Rourke, CPA, was on their measure of damages.  (*See* EXPERT
REPORT OF MICHAEL F. O'ROURKE, CPA (Sept. 14, 2009) [D.E. 117-7]).  O'Rourke calculated the
Plaintiffs' damages under the FDUTPA, common-law fraudulent inducement, conversion and civil
theft.  (*See id.* 2–3).  The Plaintiffs submitted a revised damages report on October 19 (*see* [D.E.
180-2]), and another on November 11 (*see* [D.E. 180-3]).[2]  On October 30 IMGA submitted the
rebuttal-expert report of Louis G. Dudney, CPA.  According to Dudney's report, O'Rourke, who
calculated the Plaintiffs' damages using a 2009 "delivery" date, did not consider the undisputed
decline in the Orlando real-estate market from 2006–2007, when the Plaintiffs bought their units,
and 2009, when the units were supposed to be completed as marketed.  (*See* REBUTTAL EXPERT
REPORT OF LOUIS G. DUDNEY, CPA (Oct. 30, 2009) 5–9 [D.E. 192-1]).  Then, on November 13, the
Plaintiffs submitted their fourth damages report to account for Dudney's observations.  (*See* EXPERT
REPORT OF MICHAEL F. O'ROURKE, CPA (REVISED) (Nov. 13, 2009) [D.E. 192-2]).

From May, when the case-management issues were resolved, through late September, the

_____

[2]  The October 19 report still contained damages calculations for the three claims, but the November
11 contained calculations only for the FDUTPA.  This was done to reflect the Plaintiffs' Second Amended
Complaint, which proceeded under the FDUTPA only.

3

undersigned had little interaction with the parties, although they were dealing with discovery issues with Chief U.S. Magistrate Judge Stephen T. Brown.  Concerns about the parties' experts were first brought to the Court's attention on September 30 through the Plaintiffs' Motion to Preclude Non-disclosed Experts.  (*See* Pls.' Mot. to Preclude [D.E. 117]).  The Plaintiffs asserted the Court's scheduling order required both parties to exchange expert reports in early September; IMGA responded that, since the Plaintiffs carried the burden of proof and IMGA had elected only to rebut any expert report filed by the Plaintiffs, it was not obligated to provide the Plaintiffs with a report by that deadline.  Furthermore, the Plaintiffs claimed that, based on a September 14 letter received from IMGA's counsel (*see* Letter from Jonathan F. Putnam to Chris W. Cantrell (Sept. 14, 2009) [D.E. 117-8]), Dudney's report would contain testimony that was non-rebuttal in nature.  The Plaintiffs sought to strike Dudney's report and preclude him from testifying about anything non-rebuttal in nature at trial.  (*See* Pls.' Mot. to Preclude 12).

The Court held a hearing on the status of this motion on October 7.  IMGA asserted the motion was premature.  Counsel for IMGA claimed that the September 14 date was the first time it received information on the Plaintiffs' damages theory (*see* Hr'g Tr. 12:10–17, Oct. 7, 2009); the Plaintiffs asserted that IMGA knew what their damages theory was all along because it was conveyed in their complaint, interrogatory answers, and depositions (*see id.* 15:24–16:11).  Counsel for the Plaintiffs urged a ruling that anything in IMGA's rebuttal-expert report that ended up not being truly rebuttal be stricken.  (*See id.* 19:5–8).  The Court agreed the motion was premature, but put IMGA "on notice that [it] need[s] to be very, very careful in putting together this rebuttal report and face the very likely prospect of having portions of it challenged as not true rebuttal."  (*Id.* 23:9–12).

Case No. 08-62076-CIV-ALTONAGA/McAliley

The subject of expert reports was brought to the Court's attention a second time on November 18 — this time by IMGA. (*See* Def.'s Mot. to Strike [D.E. 180]). IMGA moved to strike O'Rourke's fourth report as untimely because it was served on November 13 — the Friday before IMGA's scheduled deposition of O'Rourke the following Monday — and because "the November 13 revised report changed each aspect of the FDUTPA damages methodology to produce, for each Plaintiff, a new and different damages calculation." (*Id.* 3). In response, the Plaintiffs conceded the fourth report was untimely but agreed with IMGA that the 70 percent market-decline factor should be included in O'Rourke's calculations. The Plaintiffs opposed IMGA's motion on the ground that they had a duty to supplement the report with correct information and that IMGA would suffer no prejudice. (*See* Pls.' Resp. 1–2 [D.E. 192]).

The Court held a hearing on the motion on December 3 and denied it, regarding the Plaintiffs' late disclosure as harmless. The Court and the parties discussed the Orlando real-estate-market decline, the measure of damages, and how correctly to measure them in this case — including the issue of "delivery" — under the FDUTPA. (*See* Hr'g Tr. 18:21–28:14, Dec. 3, 2009). The Court gave Dudney three weeks to prepare a supplemental rebuttal report. (*See* SUPPLEMENTAL REBUTTAL EXPERT REPORT OF LOUIS G. DUDNEY, CPA (Dec. 24, 2009) [D.E. 212-8]).

On January 6, 2010, the day motions in *limine* were due, IMGA challenged O'Rourke's report again — this time on its merits.[3] (*See* Def.'s Omnibus Motion *in Limine* [D.E. 215]). IMGA asserted, among other things, that O'Rourke's report would produce a "windfall" recovery for the

---

[3] IMGA also challenged the admissibility of O'Rourke's first three reports.

5

Plaintiffs, one that would violate the Federal Rules of Civil Procedure, *Daubert*,[4] and Florida law. According to IMGA, O'Rourke's report would "compensate Plaintiffs for losses undisputedly caused . . . by the greatest real estate market decline in generations, an improper calculation that would, at IMGA's expense, put the Plaintiffs in a much better position than they would have been in had there been no alleged FDUTPA violation." (*Id.* 2). The Plaintiffs similarly sought to preclude Dudney from testifying. According to the Plaintiffs' motion in *limine*, Dudney's report "used a clearly flawed methodology that is inconsistent with FDUTPA case law; and . . . included an independent assessment of Plaintiffs' damages based on that flawed methodology." (Pls.' Omnibus Motions *in Limine* [D.E. 212] 12).

The Court set aside a full day of hearing for the parties' motions *in limine* on February 9, the Tuesday before the week trial was scheduled to begin. IMGA's counsel explained that the Plaintiffs, according to their allegations, had bought prerenovated units and then entered into a program with Cay Clubs under which the Plaintiffs ceded control of their units, in exchange for money, for approximately two years. During that time Cay Clubs and the Defendants were supposed to use the Plaintiffs' purchase money to renovate the units, develop the surrounding property, and build a sports facility. "[T]he impact of this," he said, "is they put their entire investment at risk." (Hr'g Tr. 9:16–17, Feb. 9, 2010). He explained that the real-estate market plummeted during the years in which Orlando Cay Clubs would be developed. He asserted that O'Rourke's fourth report, while admittedly applying a market-decline factor, "vastly overcompensates the plaintiffs, charges IMGA with damages for losses that we did not cause and, therefore, it's an improper damages analysis."

---

[4] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

Case No. 08-62076-CIV-ALTONAGA/McAliley

(*Id.* 21:12–14).

According to the Plaintiffs' counsel, "what we argue is at the date of closing when these . . . plaintiffs closed on their apartments in 2006 and 2007, what was the value of what they received, and at that date what was the value of what they were supposed to receive[.]" (*Id.* 23:1–5).  Counsel stated the Plaintiffs were originally using a delivery date under the FDUTPA "as after the leaseback period" — *i.e.*, 2009.  (*Id.* 23:8–10).  But then, because IMGA, he said, asserted delivery should be at the time of closing,

> We give [IMGA] credit for the real estate loss to come up with the actual value, what it was worth at the date of closing, and then we have the purchase price for the five star IMG soccer facility value that they paid.  The difference between those numbers is what the plaintiffs are entitled to and that's it.

(*Id.* 23:21–24:1).[5]

The undersigned expressed concerns about O'Rourke's method of measuring the Plaintiffs' damages.  The Plaintiffs requested an opportunity to file a supplemental response and cite supporting case law (*see id.* 43:15–21, 45:7–9), which the Court granted.  The Court continued the trial to mid-March.

On March 4 the Court entered an Order granting IMGA's motion and excluding O'Rourke's four reports.  First, the Court compared the measure of damages under the FDUTPA — "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract

---

[5]  To give a simple example, "given a 70 percent market decline since 2006 through 2009, a unit worth $30,000 in 2009 would have been worth $100,000 in 2006.  O'Rourke would then subtract the $100,000 from the entire purchase price to calculate the damages."  (Mar. 4, 2010, Order [D.E. 260] 3 n.2).

7

Case No. 08-62076-CIV-ALTONAGA/McAliley

of the parties" (Mar. 4, 2010, Order 5–6 (quoting *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla.

3d DCA 1984))) — with O'Rourke's report:

> O'Rourke measured the Plaintiffs' damages by taking "the difference in the market value of the unit in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the representations in the marketing and sales materials." In the next sentence he states, "The condition the unit should have been delivered in is a luxury condominium within a 5 star resort with world class amenities and IMG Academies sports training facility and complex." The Court pauses here to observe the critical and undisputed fact that, "according to the representations in the marketing and sales materials," and the Plaintiffs' understandings and allegations, the units would only have been "delivered" in this condition approximately two years after their purchase; at closing the units were not renovated and there was no sports academy. Moving on, O'Rourke states, "The market value in the condition in which it should have been delivered was calculated by adding the purchase price and mandatory club membership fee paid at closing." Putting the club-membership fee to the side, the consequence of what O'Rourke is saying is that the price the Plaintiffs paid for the units in 2006–2007 equals the market value of the units that were supposed to have been "delivered" in 2009.

(*Id.* 6–7 (footnote call number and citations omitted)). Yet there was no reason, explanation, or facts

showing how the *purchase price* of the units in 2006–2007 equaled the *market value* the units would

have had if they had been "delivered" as marketed in 2009.

Next, the Court sought to define "what the correct measure of damages may be in this case,

which appears to be unique among FDUTPA cases owing to the buy-now receive-later nature of the

transaction." (*Id.* 9). If the Plaintiffs were to continue to define the condition in which the units

should have been delivered as fully renovated units, which were supposed to have been delivered

as such only in 2009, then damages could be measured by taking "the difference in the market value

of the units in the condition in which they were delivered in 2009 and the market value of the units

8

if Orlando Cay Clubs had been completed as marketed, *also in 2009*." (*Id.* 11).[6]  Otherwise, using

the closing date, "the correct measure of damages would be the difference between the value of the

units on closing based on the expectation that they would be completed as marketed in 2009 and

assuming the truth of the alleged deception of the Defendants and Cay Clubs — presumably what

the Plaintiffs paid for them — and the value of the units at the time of the sale without the alleged

deception." (*Id.* 13).

Two days later the Plaintiffs filed the present Motion.  The Plaintiffs seek to bifurcate

---

[6]  In the course of preparing this Order the Court discovered *Schoenlein v. Routt Homes, Inc.*, 260 S.W.3d 852 (Mo. Ct. App. 2008).  In that case the plaintiffs entered into purchase contracts with the defendant for the purchase of their homes and closed on them shortly thereafter.  Per the contracts the homes were supposed to include warranties, but at closing the warranties were not included.  The plaintiffs sued under the Missouri Merchandising Practices Act, which makes "it unlawful to use 'deception, fraud, false pretense, false promise, misrepresentation, unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce.'"  *Id.* at 854 (quoting MO. REV. STAT. § 407.020).  The plaintiffs prevailed at trial.

The appellate court remanded for application of the benefit-of-the-bargain rule on damages.  "Plaintiffs did not introduce any evidence of the value of the real estate as bargained for, with the warranty, and the value of the real estate as received, without the warranty. . . .  The defrauded party should be awarded the difference between the actual value of the property and the value if it had been as represented, measuring the damages *at the time of the transaction*."  *Id.* at 855.  The plaintiffs bargained for a warranty to be delivered at closing, which was the time damages needed to be measured.  *Id.* at 854.

*Schoenlein* raises the question whether using a 2009 "delivery" date to measure damages is correct.  The undersigned has not found a Florida case stating definitively that benefit-of-the-bargain damages must be measured at the date of sale or on closing (although most do) (*see* Mar. 4, 2010, Order 10); *Heller* uses the term "delivery," and in this case the Plaintiffs bargained for fully renovated units that would be "delivered" as such in 2009, even though they closed on them in 2006–2007.  If Florida law requires damages to be measured at closing, then the Court would be required to reconsider the viability of a 2009 date by which to measure damages.

To be clear, this would not affect the Order of March 4.  The Plaintiffs would still be required to present evidence of the market value of the units in 2006–2007 as marketed, and the market value of the units in 2006–2007 without the Defendants' alleged deception.  O'Rourke's final report, while measuring damages at the time of closing, did not undertake this analysis.  (*See supra* Part III.A.).

9

liability and damages for trial or, alternatively, to continue the trial. The Plaintiffs seek such relief in order to calculate damages properly and give IMGA enough time to depose their expert. IMGA opposes both bifurcation and a continuance.

## II. LEGAL STANDARD

The decision whether to grant a continuance is within the sound discretion of the trial court. *See Arabian Am. Oil Co. v. Scarfone*, 939 F.2d 1472, 1479 (11th Cir. 1991); *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1541 (11th Cir. 1989); 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2352, at 383 (3d ed. 2008). Yet such discretion is not without its limits; in this district a court may grant a continuance of a trial "only on exceptional circumstances." S.D. FLA. L.R. 7.6. Nor may a court deny a continuance when the need for one is warranted. The U.S. Court of Appeals for the Eleventh Circuit considers the following factors when reviewing whether a trial court abused its discretion in denying a motion to continue:

> (1) the moving party's diligence in its efforts to ready its case prior to the date set for hearing; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; (4) the extent to which the moving party might have suffered harm as a result of the district court's denial.

*Romero v. Drummond Co.*, 552 F.3d 1303, 1320 (11th Cir. 2008) (quoting *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1296 (11th Cir. 2005)); *see also* WRIGHT & MILLER, *supra*, § 2352, at 401–02 ("The courts of appeals generally consider a combination of . . . factors in reviewing the denial of a continuance, preferring a flexible examination of the circumstances of the particular case rather than a mechanical application of a rigid test."). When deciding whether to grant a motion for a continuance, trial courts should consider these factors as well. *See Romero*, 552 F.3d at 1320 ("The

Case No. 08-62076-CIV-ALTONAGA/McAliley

district court considered all four factors . . . .").

## III. ANALYSIS

**A.     Diligence**

Defining the word "diligence" at a higher level of generality, there is not much dispute about the Plaintiffs' diligence: they have met their deadlines, have asked for few enlargements of time, and have been prepared. The more relevant question is whether the Plaintiffs have been diligent about proving damages, which are a necessary element of their case. *Cf. McCool v. Bridgestone/Firestone N. Am. Tire, LLC*, 222 F. App'x 847, 855 (11th Cir. 2007) ("[P]laintiffs' lack of diligence was not in failing to appear at the hearing, but in failing to prepare adequately for the *Daubert* challenge by producing evidence indicating [the] expert opinion was reliable."); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1351 (11th Cir. 2003) ("Although Quiet was diligent in its preparation for trial, there is at least some question as to the efficiency of its preparations."). Indeed, the Plaintiffs request a continuance because the Court determined that O'Rourke's reports were inadmissible, and the Plaintiffs say they cannot prove damages without them.

The Plaintiffs contend the measure of damages (*Heller*) has never been in dispute; that the problem has always been how to measure them in light of the two "delivery" dates at issue (either in 2006–2007 on closing or in 2009 when the units were supposed to be completed); that although O'Rourke did prepare four reports in all, his fourth tried to account for the market decline after Dudney served his rebuttal report; and that IMGA, contrary to its assertion, did not continually warn the Plaintiffs about what the Court later concluded to be the correct measure of damages at the time of closing. (*See* Pls.' Reply [D.E. 271] 2–4). IMGA maintains the Plaintiffs "failed — after four

11

Case No. 08-62076-CIV-ALTONAGA/McAliley

attempts — to proffer expert damages testimony that adequately accounts for the effects of market decline." (Def.'s Supplemental Resp. [D.E. 269] 11). This "lack of diligence," states IMGA, "is all the more apparent in light of the extensive notice they received" about the problems with the Plaintiffs' damages model. (*Id.* 11–12).

The Eleventh Circuit provided guidance on the meaning of diligence in a similar situation in *Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005). There, nine class representatives in a products-liability action retained an expert to prove that a pesticide to which they had been exposed was defective. Because the expert's methodology was flawed and his experience with the particular pesticide was lacking, the district court excluded the expert under *Daubert*, denied the plaintiffs' motion for a continuance to secure alternative proof on causation, and granted summary judgment for the manufacturer. *Id.* at 1291. Affirming, the Eleventh Circuit stated, "the class representatives' sole reliance on [the expert] to prove [the defect] did not represent the kind of diligence in trial preparation that merits a continuance." *Id.* at 1296 (citing, *inter alia*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 897 (1990) ("[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk.")).

That placing sole reliance on one's expert's position is not the kind of diligence meriting a continuance seems especially the case where the party has had lengthy notice by its adversary that its expert would be challenged, *see Pena v. Leombruni*, 200 F.3d 1031, 1035 (7th Cir. 1999) ("The plaintiffs had been on notice for months that their expert might be excluded, yet they did nothing to find a back up and thus mitigate the harm to them should he be excluded and a continuance be denied."), although it is true that a party who relies on an expert is always deemed to know of the

Case No. 08-62076-CIV-ALTONAGA/McAliley

requirements of the Federal Rules of Evidence and *Daubert*, *see Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000) ("Since *Daubert* . . . parties relying on expert evidence have had notice of the exacting standards of reliability such evidence must meet.").

With these principles in mind the Court examines whether the Plaintiffs have been diligent in proving damages. The Plaintiffs would likely not be able to prove damages — an element of the FDUTPA, *see Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) — without expert testimony.[7] Accordingly the Plaintiffs retained O'Rourke, who disclosed the first report on September 14 and, after receiving IMGA's rebuttal report in late October, disclosed his fourth report on November 13.[8] In his first three reports O'Rourke measured damages as "the difference in market value of the unit in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the representations in the marketing and sales materials." He defined "[t]he condition the unit should have been delivered in" as "a luxury condominium within a 5 star resort with world class amenities and IMG Academies sports training facility and complex," which was supposed to have been delivered as such in 2009. O'Rourke assumed "the purchase price represented the future value of the complete[d] units in 2009" (Pls.' Reply 3), and then subtracted from that the "current appraised market value" to calculate damages. The main problem with these reports was the assumption that the purchase price represented the future value of the completed units; O'Rourke did not consider whether any number of factors, the

_____

[7] The Court writes "likely" because, even though the Plaintiffs seem to concede they could not prevail at trial without a damages expert, whether that is, in fact, true is an issue not before the Court.

[8] O'Rourke's second and third reports were largely identical to the first.

13

most salient of which was the market decline, would affect that value.  Nor did the Plaintiffs retain a different expert to calculate what the market value of a fully renovated unit would have been if it had been completed as marketed.

To their credit the Plaintiffs tried to account for the market decline in O'Rourke's fourth report.  Rather than using the 2009 "delivery" date, O'Rourke used the 2006–2007 date when the Plaintiffs closed on their units.  And taking the appraised value of the units in 2009, he then determined what they would have been worth in 2006–2007 before they lost 66 percent of their value.  The difference between the purchase price and those values represented the Plaintiffs' damages.  There were two problems with this model, as the Court explained in the March 4 Order. First, O'Rourke did not re-define the condition in which the units were supposed to have been delivered and the condition in which the units were delivered on closing.  Most conspicuously O'Rourke continued to assert that the units should have been delivered as "luxury condominium[s] within a 5 star resort with world class amenities and IMG Academies sports training facility and complex."  That undisputedly would not have been delivered on closing, as the Court and the parties discussed at length at the hearing on February 9.  Second, and perhaps as a consequence of the first, O'Rourke's calculations of what the units would have been worth in 2006–2007 did not encapsulate the market value of what the Plaintiffs actually received on closing.  That is, the Plaintiffs paid $350,000 each for an unrenovated unit with the expectation that it would be developed as marketed and, allegedly, with the understanding, for example, that IMGA and Cay Clubs were in a partnership and that IMGA was obligated to build the sports facility.  At closing the Plaintiffs received the same unrenovated units, but IMGA was not in a partnership with Cay Clubs and IMGA was not obligated

Case No. 08-62076-CIV-ALTONAGA/McAliley

to build the sports facility.  It was the market value of this condition that O'Rourke did not try to calculate in his fourth report.

There is no reason to conclude that the Plaintiffs did not try to calculate damages appropriately.  Yet, in regard to the first three reports, the Plaintiffs did not try to calculate what the market value of the units would have been in 2009 if the units had been completed as marketed; O'Rourke merely assumed the market value equaled the purchase price.  And although the Plaintiffs used a closing-date analysis after IMGA made some of the reports' flaws known to the Plaintiffs, the Plaintiffs did not re-define their damages model as it needed to be, and the Plaintiffs did not determine the market values based on that model.  In sum, although the Plaintiffs may have tried to calculate damages appropriately, the Plaintiffs were on notice at least four months before IMGA filed its motion *in limine* not only of the real-estate-market decline, but also of the real possibility that O'Rourke's testimony would be stricken.  *See Pena*, 200 F.3d at 1035.  The Plaintiffs had time to figure this out.  Last, the Court is fully aware that calculating damages appropriately in this case — one in which how to define "delivery" is uncertain — presents a challenge.  But uncertainty about how to measure damages calls for more or varied models in the event one (or more) is stricken on the eve of trial.  *Cf. Rink*, 400 F.3d at 1296.[9]  The Plaintiffs tried to put forth an admissible damages

_____

[9]  In their diligence section the Plaintiffs rely on *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538 (11th Cir. 1989).  In *Dempsey* the court granted a plaintiff's motion for a continuance on the day of trial so he could retain an economist to calculate the present value of his future lost wages.  The court did so because the defendant had previously asked for and was granted three continuances, and the court wanted "to ensure that the damage issue could be fully explored at trial."  *Id.* at 1541.  Admonishing the plaintiff's counsel for failing to retain an expert, the Eleventh Circuit nevertheless held that "a continuance under these circumstances was not an abuse of discretion."  *Id. Dempsey*, however, does not help the Plaintiffs on the question of diligence; rather, it shows the breadth of a court's discretion in granting a continuance.  To be sure, in *Dempsey* the plaintiff's counsel was eminently *not* diligent.

model, but did not shore up any of their reports' shortcomings.

**B.      Usefulness of the continuance**

The Plaintiffs assert that there is a substantial likelihood a continuance will remedy their need

for one because they are now guided by the framework of the March 4 Order.  According to the

Plaintiffs, their experts have indicated that information is available to calculate the damages under

either a 2006–2007 or a 2009 delivery-date analysis.  IMGA asserts that the Plaintiffs have already

produced four expert reports, and there is no reason to believe that the Plaintiffs will be successful

in their fifth.  *See Weisgram*, 528 U.S. at 455 ("It is implausible to suggest, post-*Daubert*, that parties

will initially present less than their best expert evidence in the expectation of a second chance should

their first try fail.").

The Court has no way accurately to determine the likelihood that a continuance will allow

the Plaintiffs to measure damages properly.  This is not a case, for example, where a continuance is

requested simply to hire a lawyer, *e.g.*, *United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th

Cir. 1969), to recover from an illness, *e.g.*, *Smith-Weik Mach. Corp. v. Murdock Mach. & Eng'g Co.*,

423 F.2d 842, 845 (5th Cir. 1970), or even to analyze a report "in a more comfortable timeframe,"

*Quiet Tech. DC-8*, 326 F.3d at 1351 — that is, a case in which it can be said with some measurable

degree of confidence that granting the continuance will remedy the need for it.  Here, the Plaintiffs

may be required to retain another expert, perform appraisals, and so forth.  Both parties agree there

will be an additional *Daubert* motion (if not more) as to this first trial group, the outcome of which

is unknown.  The Plaintiffs may very well be correct that calculating damages would not be futile

or impossible.  But the Court, again, cannot accurately determine the likelihood that the Plaintiffs

will be successful in doing so. *See Romero*, 552 F.3d at 1320–21 ("It is well-settled that a district court may deny a continuance when there is no guarantee that granting one will enable a party to secure the crucial testimony."). This factor neither weighs for nor against.

## C.     Inconvenience to the Court and to IMGA

The Plaintiffs concede IMGA will be inconvenienced, but they contend any such inconvenience will be insignificant because IMGA would be required to incur the same expenses with the second trial group. The Plaintiffs assert that IMGA would not need to re-depose the first trial group because the Plaintiffs' depositions were completed before the expert reports were exchanged. Moreover, the Plaintiffs would not need to be re-deposed because they do not know nor are they competent to testify about their losses. For its part IMGA asserts it "would need to conduct massive additional fact and expert discovery in order even to come close to having an adequate opportunity to prepare its defense." (Def.'s Supplemental Resp. 15). The additional costs and delay associated with repeating discovery, solely because the "Plaintiffs made the tactical decision to pursue windfall damages, would be grossly unfair." (*Id.*). Furthermore, granting a continuance would inconvenience the Court and the court system because the Court would need to preside over and decide further motions and, possibly, an unnecessary trial. A jury would need to be empaneled as well.

The inconvenience to IMGA weighs heavily against granting a continuance. Putting aside for the moment the question of the future trial groups (which will be discussed separately), granting a continuance to allow the Plaintiffs another opportunity to calculate their damages would require reopening (at a minimum) expert discovery as to this first trial group. Depending on the content of the

Plaintiffs' new report or reports, IMGA may need to retain experts in addition to Dudney. IMGA's counsel and those experts would be required, yet again, to become familiar with and study any reports the Plaintiffs produce. IMGA's expert or experts would be required to produce a rebuttal report or reports. IMGA would be required to depose the Plaintiffs' expert or experts and, in addition, defend any depositions the Plaintiffs would take of IMGA's expert or experts. There would be additional motion practice on the experts' admissibility. The first trial would be delayed by months, although it is unknown by how many. And there is, of course, the duplication of expenses already incurred as to this first trial group far exceeding any budget IMGA may have set aside to defend the first trial.

The Court stated at the hearing that there is little inconvenience to the Court, as having a trial as to this first trial group in no way guaranteed finality or that the Court would not have to address future discovery motions, dispositive motions, or motions in *limine* as to the remaining trial groups. Regardless of the outcome of this Motion, the Plaintiffs would still have another opportunity of calculating damages (for the second trial group) which would necessarily require the Court to review, hear, and decide at least one additional *Daubert* motion. Upon further reflection, however, the inconvenience in granting a continuance is that the Court would be confronted with another round of discovery, dispositive and *in limine* motions as to the first trial group, a group all thought had concluded the work required pre-trial. It is, of course, the Court's constitutional obligation to preside over and decide cases, but these are factors the Court must consider.

**D.      The extent to which the Plaintiffs may be harmed by a denial**

"[T]he denial of a continuance does not rise to the level of an abuse of discretion unless the

decision 'severely prejudices' the moving party." *Quiet Tech. DC-8*, 326 F.3d at 1351 (citing *Smith-Weik Mach. Corp.*, 423 F.2d at 844)).   The Plaintiffs assert the denial of a continuance would severely prejudice them because they "will lose their claims and day in court."   (Pls.' Reply 9). IMGA disagrees, stating that "any such harm will not be prejudicial within the meaning of the Eleventh Circuit case law, as it will have resulted from Plaintiffs' own calculated decisions." (Def.'s Supplemental Resp. 16).   IMGA also contends that any harm the Plaintiffs may suffer would not be prejudicial because "it would merely flow from the operation of the rules of evidence."   (*Id.*).

The parties disagree about what the terms "harm" and "prejudice" mean within the context of a denial of a motion for a continuance.   There are not clear definitions of the terms in the cases. Prejudice has not been found in cases like *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003).   There, about a month before trial, a party moved for a continuance in order better to prepare a challenge of the opposing party's expert.   Concluding that it was not an abuse of discretion to deny the continuance, the Eleventh Circuit stated, "[the movant] suffered no harm as a result of the denial of the continuance because its *Daubert* challenge is unavailing on its merits."   *Id.* at 1351.   The idea is that time to prepare or secure additional evidence would not have aided the movant even if the continuance had been granted.   This is probably the most common reason why courts find that a denial has not caused prejudice or harm.   *See Romero*, 552 F.3d at 1321; *Pena*, 200 F.3d at 1035; *Brooks v. United States*, 64 F.3d 251, 257 (7th Cir. 1995); 8 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 40.02[5][b], at 40-11 & n.36 (3d ed. 2010).

Conversely, denials have been held to cause prejudice where, for example, a party needed time to obtain new counsel, or to allow a sick attorney to recuperate, but, because of the denial, was

required to proceed with unfamiliar counsel or none at all. *See Anderson v. Sheppard*, 856 F.2d 741, 748–49 (6th Cir. 1988); *Gaspar v. Kassm*, 493 F.2d 964, 969 (3d Cir. 1974); *Smith-Weik Mach. Corp.*, 423 F.2d at 844–45; WRIGHT & MILLER, *supra*, § 2352, at 400–01 & nn. 12–13. A denial of a continuance has also caused prejudice where a *pro se* prisoner was forced to go to trial without an opportunity to serve all the relevant defendants. *See Fowler v. Jones*, 899 F.2d 1088, 1093–96 (11th Cir. 1990).

Neither kind of case is perfectly analogous to this one. Unlike the first, a continuance, as the Plaintiffs assert, may allow them to put forth an admissible damages model; at a minimum it would give them an opportunity to do so. Unlike the second kind of case, the Plaintiffs' "harm," in the sense of being unable to prevail at trial, is of a quite different flavor. Such harm would not arise, for example, from being forced to go to trial without their attorneys because their counsel withdrew two days before — an event not in a litigant's control, not foreseeable, and one that could easily be fixed. The Plaintiffs have had a full and fair opportunity to put forth admissible evidence on damages. Any harm they would suffer because they have failed to do so, with a trial date looming just days away, cannot properly be attributable to the denial of a continuance. Indeed, in this sense the harm does not differ at all from that any litigant suffers on losing a motion to dismiss or a motion for summary judgment.[10] In any event, with the relief fashioned below, this first group of trial Plaintiffs is not

---

[10] At any rate, even if denying their continuance harms the Plaintiffs, the Court doubts it would "severely prejudice" them as that phrase is contemplated. The Eleventh Circuit has "affirmed the denial of a continuance *even when* it would have enabled the moving party to secure the crucial evidence." *Romero*, 552 F.3d at 1320 (discussing *Rink*, 400 F.3d at 1296)). If denying a continuance for such a purpose "severely prejudiced" the movant, then *Rink* should have come out differently. Indeed, such a denial would have been an abuse of discretion. *See Quiet Tech. DC-8*, 326 F.3d at 1351. The Plaintiffs here seek a continuance to secure crucial evidence on damages.

being deprived of its day in court.

**E.     Other Considerations**

Two further considerations merit discussion.  The first is how (or whether) the additional trial groups should influence any of the foregoing analysis.  According to the Plaintiffs, IMGA and the Court will not be inconvenienced because the issue of calculating damages — and all the time, effort, and expense associated with doing so — will have to be addressed, regardless of whether it is with the first trial group or the second.  And if the first trial group does not prevail because O'Rourke's testimony has been stricken, the Plaintiffs contend that the first trial group will neither have impacted nor informed the remaining trial groups (a practical consequence of dividing the Plaintiffs into trial groups).

For its part IMGA questions the logic (and appropriateness) of using this consideration as a factor.

> If [the Plaintiffs'] next effort fails [at producing admissible evidence of damages], the same logic that would have driven the Court's decision to allow Plaintiffs a fifth chance will still be present, but will Plaintiffs be permitted a sixth chance?  If not, then there is no valid reason to permit them a fifth chance now.  If so, then the Court would have set up a process wherein Plaintiffs will have unlimited successive opportunities to submit a damages expert for the first-trial group, which is plainly an unacceptable result . . . .

(Def.'s Supplemental Resp. 19).  Further, if the Plaintiffs receive a continuance and put forth admissible evidence of damages, then the Plaintiffs will still have to decide whether to continue with the second trial group if they do not prevail at trial.  (*See id.*).  If, on the other hand, the Plaintiffs prevail, then there is no reason to believe that a cost-benefit analysis will compel IMGA to settle the remaining claims.  That is because many of the remaining Plaintiffs made their purchases before

IMGA even created the marketing materials on which the Plaintiffs purport to establish liability, according to IMGA. (*See id.* 19–20). Last, IMGA states that the first-trial group has served its test-case purpose "as much as it ever will." (*Id.* 20).

Assuming a denial means the Plaintiffs in the first trial group cannot prevail, and assuming the Plaintiffs move forward with the second trial group, then inconvenience to IMGA and the Court is less than it would be if there had been no second trial group at all. That is, as the Plaintiffs envision, the parties will begin discovery again (although it is unclear when; there is no scheduling order yet), which will require retaining experts and developing reports on damages. The parties will have to become familiar with each other's experts and prepare motions on their admissibility. And the Court will preside over and decide any of these motions.

Still, the Court set a February 2010 trial date at the outset of the case, and IMGA contends it has budgeted appropriately for resolution of the first trial group around that time. The Court cannot discount this consideration, or IMGA's expectation of finality for the first trial group in early 2010 either. And so, although the Court agrees with the Plaintiffs that the inconvenience to IMGA and the Court would be less than if there had been only one trial group, it cannot be said that the inconvenience caused by such a continuance would be minimal.

Furthermore, there cannot be unlimited opportunities in order to allow the Plaintiffs to put forth admissible evidence of damages, just as there cannot be unlimited opportunities for any litigant to prove an essential element of her case. *See* FED. R. CIV. P. 1 ("[The Federal Rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). And many of the benefits of the first trial group have been realized. The case

has provided both parties with information to evaluate the merits of their respective cases. Although the decision whether to settle or proceed with the remaining cases may be clearer (or easier) after the outcome of a trial, both parties may now apply what they have learned to the remaining trial groups.[11]

The second consideration, one that weights heavily against continuing the case, is one of basic fairness. Granting a continuance to allow the Plaintiffs another opportunity to produce admissible evidence of damages as to the first trial group — especially after IMGA has notified the Plaintiffs of flaws in their damages model, of their intent to preclude it, and after clearly spending considerable time, thought, and money to defeat it — strikes the Court as extraordinarily unfair. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249 (6th Cir. 2001); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 386 (S.D.N.Y. 2003). The Court has held IMGA to the same standards as the Plaintiffs, and even warned IMGA that it had to be careful with respect to its "rebuttal" expert report; if it was non-rebuttal, it would be stricken. The Plaintiffs assert IMGA's work has not been in vain, because it "eliminat[ed] a damage calculation that it believed was unfair." (Pls.' Reply 7). While that is true, such reasoning could just as easily apply, if the Court were to grant the continuance, to the next damages calculation IMGA may defeat. A party who has had a full and fair opportunity to present its best case, but who nevertheless does not prevail, does not get another chance (except on

---

[11] It is perfectly reasonable to continue a trial if both parties are working together to achieve a settlement. But where that is not the case and one party is ready to go to trial (as is the case here), the Court has it doubts about whether continuing a case in order to cause a settlement would be within its discretion. *Cf. Anderson*, 856 F.2d at 749 ("[T]he record provides no reasonable justification for the district court's denial of the continuance. . . . [A] court should not use the threat of trial without counsel as a means of achieving a pretrial disposition of a case. That the court has concluded the settlement offer would be in the best interests of the litigant is wholly immaterial."). That is an issue, however, the Court does not need to decide, because it is persuaded by IMGA's other points.

Case No. 08-62076-CIV-ALTONAGA/McAliley

appeal). The issue of damages may be decided later on. But finality weighs against redoing the issue now, at least in regard to the first trial group. *Cf.* 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2857, at 257 (2d. ed. 1995).

## IV. CONCLUSION

The factors do not weigh in favor of a continuance because they do not establish "exceptional circumstances." S.D. FLA. L.R. 7.6. They establish, rather, the unexceptional circumstance with which litigants and courts are always confronted after a ruling on a pretrial motion that appears to have a dispositive impact on the case. At any rate, the continuance is requested in order to reopen expert discovery to put forth admissible evidence of damages as to the first trial group. Doing so would inconvenience IMGA and the Court (which would have to address discovery motions, dispositive motions, and *Daubert* motions as to the first trial group yet again), and would be unfair to IMGA as well. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1.      The Motion **[D.E. 264]** is **DENIED**.[12]  The first group of trial Plaintiffs are not permitted to re-open discovery and motion practice for purposes of presenting a new damages report. The Court will revisit the status of the first trial group of Plaintiffs at the conclusion of the case,

---

[12]  The Court declines to bifurcate liability and damages for trial, for three principal reasons. First, damages are an element of the FDUTPA. *See Rollins*, 951 So. 2d at 869. The Plaintiffs therefore cannot establish liability without presenting admissible evidence of damages. If the Plaintiffs were unable to do so, the whole "liability" phase of the trial would be for naught. Second, this is a complicated case, with issues that may overlap. IMGA asserts, for example, that it would have to examine the Plaintiffs with respect both to the issue of "liability" and of damages; doing so would greatly prolong any trial. Last are the reasons discussed herein. It would be an inconvenience to reopen the issue of damages and it would be unfair — and even more so during a trial.

Case No. 08-62076-CIV-ALTONAGA/McAliley

after the remaining groups of Plaintiffs have had their claims tried.

2.   According to the Order of November 5, 2009 [D.E. 162], the deadline for filing summary judgment motions was November 17, 2009.  While it presented a motion for summary judgment on other grounds, IMGA did not file a motion for summary judgment on the basis that no dispute of material fact existed as to the absence of evidence of damages, predicated upon the inadmissibility of O'Rourke's opinions.  Therefore, it is not allowed to file an untimely motion for summary judgment raising this argument.  *See* FED. R. CIV. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").

3.   The parties shall, by **April 5, 2010**, file a proposed scheduling report addressing the second group of Plaintiffs who are to proceed to trial.  Because Plaintiffs were permitted to select the number and composition of the first trial group, IMGA will now have the opportunity of designating the number and composition of the second trial group.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 22nd day of March, 2010.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATE DISTRICT JUDGE**

cc:     counsel of record

25